## VLANDIS v. KLINE ET AL.

No. 72–493.  Argued March 20, 1973—Decided June 11, 1973

STEWART, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and POWELL, JJ., joined. MARSHALL, J., filed a concurring opinion, in which BRENNAN, J., joined, *post*, p. 454. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 456. BURGER, C. J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 459. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and DOUGLAS, J., joined, *post*, p. 463.

*John G. Hill, Jr.,* Assistant Attorney General of Connecticut, argued the cause for appellant. With him on the brief was *Robert K. Killian,* Attorney General.

*John A. Dziamba* argued the cause for appellees. With him on the brief was *Douglas M. Crockett.**

MR. JUSTICE STEWART delivered the opinion of the Court.

Like many other States, Connecticut requires non-residents of the State who are enrolled in the state university system to pay tuition and other fees at higher rates than residents of the State who are so enrolled. Conn. Gen. Stat. Rev. § 10–329 (b) (Supp. 1969), as amended by Public Act No. 5, § 122 (June Sess. 1971).[1] The constitutional validity of that requirement is not at issue in the case before us. What is at issue here is Connecticut's statutory definition of residents and non-residents for purposes of the above provision.

Section 126 (a)(2) of Public Act No. 5, amending § 10–329 (b), provides that an unmarried student shall be classified as a nonresident, or "out of state," student if his "legal address for any part of the one-year period immediately prior to his application for admission at a constituent unit of the state system of higher education was outside of Connecticut." With respect to married students, § 126 (a)(3) of the Act provides that such a student, if living with his spouse, shall be classified as

---

*Leonard J. Schwartz* filed a brief for the American Civil Liberties Union of Ohio, Inc., as *amicus curiae* urging affirmance.

*Slade Gorton,* Attorney General, *James B. Wilson,* Senior Assistant Attorney General, and *Gerald L. Coe,* Assistant Attorney General, filed a brief for the State of Washington as *amicus curiae.*

[1] Section 122 of that Act provides that "the board of trustees of The University of Connecticut shall fix fees for tuition of not less than three hundred fifty dollars for residents of this State and not less than eight hundred fifty dollars for nonresidents . . . ." Pursuant to this statute, the University promulgated regulations fixing the tuition per semester as follows:

"out of state" if his "legal address at the time of his application for admission to such a unit was outside of Connecticut." These classifications are permanent and irrebuttable for the whole time that the student remains at the university, since § 126 (a)(5) of the Act commands that: "The status of a student, as established at the time of his application for admission at a constituent unit of the state system of higher education under the provisions of this section, shall be his status for the entire period of his attendance at such constituent unit." The present case concerns the constitutional validity of this conclusive and unchangeable presumption of nonresident status from the fact that, at the time of application for admission, the student, if married, was then living outside of Connecticut, or, if single, had lived outside the State at some point during the preceding year.

One appellee, Margaret Marsh Kline, is an undergraduate student at the University of Connecticut. In May 1971, while attending college in California, she became engaged to Peter Kline, a lifelong Connecticut resident. Because the Klines wished to reside in Connecticut after their marriage, Mrs. Kline applied to the University of Connecticut from California. In late May, she was accepted and informed by the University that she would be considered an in-state student. On June 26, 1971, the appellee and Peter Kline were married in California, and soon thereafter took up residence in Storrs, Connecticut, where they have established

| | Fall semester 1971–72 | Spring semester 1972, and thereafter |
|---|---|---|
| In-state student | None | $175.00 |
| Out-of-state student | $150.00 | $425.00 |

In addition, out-of-state students must pay a $200 nonresident fee per semester.

a permanent home. Mrs. Kline has a Connecticut driver's license, her car is registered in Connecticut, and she is registered as a Connecticut voter. In July 1971, Public Act No. 5 went into effect. Accordingly, the appellant, Director of Admissions at the University of Connecticut, irreversibly classified Mrs. Kline as an out-of-state student, pursuant to § 126 (a)(3) of that Act. As a consequence, she was required to pay $150 tuition and a $200 nonresident fee for the first semester, whereas a student classified as a Connecticut resident paid no tuition; and upon registration for the second semester, she was required to pay $425 tuition plus another $200 nonresident fee, while a student classified as a Connecticut resident paid only $175 tuition.[2]

The other appellee, Patricia Catapano, is an unmarried graduate student at the same University. She applied for admission from Ohio in January 1971, and was accepted in February of that year. In August 1971, she moved her residence from Ohio to Connecticut and registered as a full-time student at the University. Like Mrs. Kline, she has a Connecticut driver's license, her car is registered in Connecticut, and she is registered as a Connecticut voter. Pursuant to § 126 (a)(2) of the 1971 Act, the appellant classified her permanently as an out-of-state student. Consequently, she, too, was required to pay $150 tuition and a $200 nonresident fee for her first semester, and $425 tuition plus a $200 nonresident fee for her second semester.

Appellees then brought suit in the District Court pursuant to the Civil Rights Act of 1871, 42 U. S. C. § 1983, contending that they were bona fide residents of Connecticut, and that § 126 of Public Act No. 5, under which they were classified as nonresidents for purposes of their tuition and fees, infringed their rights to due process of law

---

[2] See n. 1, supra.

and equal protection of the laws, guaranteed by the Fourteenth Amendment to the Constitution.[3] After the convening of a three-judge District Court, that court unanimously held §§ 126 (a)(2), (a)(3), and (a)(5) unconstitutional, as violative of the Fourteenth Amendment, and enjoined the appellant from enforcing those sections. 346 F. Supp. 526 (1972). The court also found that before the commencement of the spring semester in 1972, each appellee was a bona fide resident of Connecticut; and it accordingly ordered that the appellant refund to each of them the amount of tuition and fees paid in excess of the amount paid by resident students for that semester. On December 4, 1972, we noted probable jurisdiction of this appeal. 409 U. S. 1036.

The appellees do not challenge, nor did the District Court invalidate, the option of the State to classify students as resident and nonresident students, thereby obligating nonresident students to pay higher tuition and fees than do bona fide residents. The State's right to make such a classification is unquestioned here. Rather, the appellees attack Connecticut's irreversible and irrebuttable statutory presumption that because a student's legal address was outside the State at the time of his application for admission or at some point during the preceding year, he remains a nonresident for as long as he is a student there. This conclusive presumption, they say, is invalid in that it allows the State to classify as "out-of-state students" those who are, in fact, bona fide residents of the State. The appellees claim that they have a constitutional right to controvert

___

[3] While the case was pending in the District Court, the Connecticut Legislature passed a bill relating to tuition payments by nonresidents, House Bill No. 5302, which would have repealed the particular portions of the statute that were under constitutional attack. On May 18, 1972, however, the Governor of Connecticut vetoed that bill.

that presumption of nonresidence by presenting evidence that they are bona fide residents of Connecticut. The District Court agreed: "Assuming that it is permissible for the state to impose a heavier burden of tuition and fees on non-resident than on resident students, the state may not classify as 'out of state students' those who do not belong in that class." 346 F. Supp., at 528. We affirm the judgment of the District Court.

Statutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments. In *Heiner* v. *Donnan,* 285 U. S. 312 (1932), the Court was faced with a constitutional challenge to a federal statute that created a conclusive presumption that gifts made within two years prior to the donor's death were made in contemplation of death, thus requiring payment by his estate of a higher tax. In holding that this irrefutable assumption was so arbitrary and unreasonable as to deprive the taxpayer of his property without due process of law, the Court stated that it had "held more than once that a statute creating a presumption which operates to deny a fair opportunity to rebut it violates the due process clause of the Fourteenth Amendment." *Id.,* at 329. See, *e. g., Schlesinger* v. *Wisconsin,* 270 U. S. 230 (1926); *Hoeper* v. *Tax Comm'n,* 284 U. S. 206 (1931). See also *Tot* v. *United States,* 319 U. S. 463, 468–469 (1943); *Leary* v. *United States,* 395 U. S. 6, 29–53 (1969). Cf. *Turner* v. *United States,* 396 U. S. 398, 418–419 (1970).

The more recent case of *Bell* v. *Burson,* 402 U. S. 535 (1971), involved a Georgia statute which provided that if an uninsured motorist was involved in an accident and could not post security for the amount of damages claimed, his driver's license must be suspended without any hearing on the question of fault or responsibility. The Court held that since the State purported to be concerned with fault in suspending a driver's license, it

could not, consistent with procedural due process, conclusively presume fault from the fact that the uninsured motorist was involved in an accident, and could not, therefore, suspend his driver's license without a hearing on that crucial factor.

Likewise, in *Stanley* v. *Illinois*, 405 U. S. 645 (1972), the Court struck down, as violative of the Due Process Clause of the Fourteenth Amendment, Illinois' irrebuttable statutory presumption that all unmarried fathers are unqualified to raise their children. Because of that presumption, the statute required the State, upon the death of the mother, to take custody of all such illegitimate children, without providing any hearing on the father's parental fitness. It may be, the Court said, "that most unmarried fathers are unsuitable and neglectful parents. . . . But all unmarried fathers are not in this category; some are wholly suited to have custody of their children." *Id.*, at 654. Hence, the Court held that the State could not conclusively presume that any individual unmarried father was unfit to raise his children; rather, it was required by the Due Process Clause to provide a hearing on that issue. According to the Court, Illinois "insists on presuming rather than proving Stanley's unfitness solely because it is more convenient to presume than to prove. Under the Due Process Clause that advantage is insufficient to justify refusing a father a hearing . . . ." *Id.*, at 658.[4]

---

[4] Moreover, in *Carrington* v. *Rash*, 380 U. S. 89 (1965), the Court held that a permanent irrebuttable presumption of nonresidence violated the Equal Protection Clause of the Fourteenth Amendment. That case involved a provision of the Texas Constitution which prohibited any member of the Armed Forces who entered the service as a resident of another State and then moved his home to Texas during the course of his military duty, from ever satisfying the residence requirement for voting in Texas elections, so long as he remained a member of the Armed Forces. The effect of that provision was to create a conclusive presumption that all

The same considerations obtain here. It may be that most applicants to Connecticut's university system who apply from outside the State or within a year of living out of State have no real intention of becoming Connecticut residents and will never do so. But it is clear that not all of the applicants from out of State inevitably fall in this category. Indeed, in the present case, both appellees possess many of the indicia of Connecticut residency, such as year-round Connecticut homes, Connecticut drivers' licenses, car registrations, voter registrations, etc.; and both were found by the District Court to have become bona fide residents of Connecticut before the 1972 spring semester. Yet, under the State's statutory scheme, neither was permitted any opportunity to demonstrate the bona fides of her Connecticut residency for tuition purposes, and neither will ever have such an opportunity in the future so long as she remains a student.

The State proffers three reasons to justify that permanent irrebuttable presumption. The first is that the State has a valid interest in equalizing the cost of public higher education between Connecticut residents and nonresidents, and that by freezing a student's residential status as of the time he applies, the State ensures that its bona fide in-state students will receive their full subsidy. The State's objective of cost equalization between bona fide residents and nonresidents may well be legitimate, but basing the bona fides of residency solely on where a student lived when he applied for admission

servicemen who moved to Texas during their military service, even if they became bona fide residents of Texas, nonetheless remained nonresidents for purposes of voting. The Court held that "[b]y forbidding a soldier ever to controvert the presumption of nonresidence, the Texas Constitution imposes an invidious discrimination in violation of the Fourteenth Amendment." *Id.*, at 96. See also *Dunn* v. *Blumstein*, 405 U. S. 330, 349–352 (1972); *Shapiro* v. *Thompson*, 394 U. S. 618 (1969).

to the University is using a criterion wholly unrelated to that objective. As is evident from the situation of the appellees, a student may be a bona fide resident of Connecticut even though he applied to the University from out of State. Thus, Connecticut's conclusive presumption of nonresidence, instead of ensuring that only its bona fide residents receive their full subsidy, ensures that certain of its bona fide residents, such as the appellees, do *not* receive their full subsidy, and can never do so while they remain students.

Second, the State argues that even if a student who applied to the University from out of State may at some point become a bona fide resident of Connecticut, the State can nonetheless reasonably decide to favor with the lower rates only its established residents, whose past tax contributions to the State have been higher. According to the State, the fact that established residents or their parents have supported the State in the past justifies the conclusion that applicants from out of State—who are presumed not to be such established residents—may be denied the lower rates, even if they have become bona fide residents.

Connecticut's statutory scheme, however, makes no distinction on its face between established residents and new residents. Rather, through § 122, the State purports to distinguish, for tuition purposes, between residents and nonresidents by granting the lower rates to the former and denying them to the latter.[5] In these circumstances, the State cannot now seek to justify its classification of certain bona fide residents as nonresidents, on the basis that their Connecticut residency is "new."

Moreover, § 126 would not always operate to effectuate the State's asserted interest. For it is not at all clear that the conclusive presumption required by that section prevents only "new" residents, rather than "es-

---

[5] See n. 1, *supra*.

tablished" residents, from obtaining the lower tuition rates. For example, a student whose parents were lifelong residents of Connecticut, but who went to college at Harvard, established a legal address there, and applied to the University of Connecticut's graduate school during his senior year, would be permanently classified as an "out of state student," despite his family's status as "established" residents of Connecticut. Similarly, the appellee Kline may herself be a "new" resident of Connecticut; but her husband is an established, lifelong resident, whose past tax contribution to the State, under the State's theory, should entitle his family to the lower rates. Conversely, the State makes no attempt to ensure that those students to whom it does grant in-state status are "established" residents of Connecticut. Any married person, for instance, who moves to Connecticut before applying to the University would be considered a Connecticut resident, even if he has lived there only one day. Thus, even in terms of the State's own asserted interest in favoring established residents over new residents, the provisions of § 126 are so arbitrary as to constitute a denial of due process of law.[6]

---

[6] But even if we accepted the State's argument that its statutory scheme operates to apportion tuition rates on the basis of old and new residency, that justification itself would give rise to grave problems under the Equal Protection Clause of the Fourteenth Amendment. For in *Shapiro* v. *Thompson, supra,* the Court rejected the contention that a challenged classification could be sustained as an attempt to distinguish between old and new residents on the basis of the contribution they have made to the community through past payment of taxes. That reasoning, the Court stated, "would logically permit the State to bar new residents from schools, parks, and libraries or deprive them of police and fire protection. Indeed it would permit the State to apportion all benefits and services according to the past tax contributions of its citizens. The Equal Protection Clause prohibits such an apportionment of state services." 394 U. S., at 632–633. Cf. *Carrington* v. *Rash,* 380 U. S., at 96; *Dunn* v. *Blumstein,* 405 U. S., at 354.

The third ground advanced to justify § 126 is that it provides a degree of administrative certainty. The State points to its interest in preventing out-of-state students from coming to Connecticut solely to obtain an education and then claiming Connecticut residence in order to secure the lower tuition and fees. The irrebuttable presumption, the State contends, makes it easier to separate out students who come to the State solely for its educational facilities from true Connecticut residents, by eliminating the need for an individual determination of the bona fides of a person who lived out of State at the time of his application. Such an individual determination, it is said, would not only be an expensive administrative burden, but would also be very difficult to make, since it is hard to evaluate when bona fide residency exists. Without the conclusive presumption, the State argues, it would be almost impossible to prevent out-of-state students from claiming a Connecticut residence merely to obtain the lower rates.

In *Stanley* v. *Illinois, supra,* however, the Court stated that "the Constitution recognizes higher values than speed and efficiency." 405 U. S., at 656. The State's interest in administrative ease and certainty cannot, in and of itself, save the conclusive presumption from invalidity under the Due Process Clause where there are other reasonable and practicable means of establishing the pertinent facts on which the State's objective is premised. In the situation before us, reasonable alternative means for determining bona fide residence are available. Indeed, one such method has already been adopted by Connecticut; after § 126 was invalidated by the District Court, the State established reasonable criteria for evaluating bona fide residence for purposes of tuition and fees at its university system.[7] These criteria,

---

[7] See *infra,* at 454.

while perhaps more burdensome to apply than an irrebuttable presumption, are certainly sufficient to prevent abuse of the lower, in-state rates by students who come to Connecticut solely to obtain an education.[8]

In sum, since Connecticut purports to be concerned with residency in allocating the rates for tuition and fees in its university system, it is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of nonresidence, when that presumption is not necessarily or universally true in fact, and when the State has reasonable alternative means of making the crucial determination. Rather, standards of due process require that the State allow such an individual the opportunity to present evidence showing that he is a bona fide resident entitled to the in-state rates. Since § 126 precluded the appellees from ever rebutting the presumption that they were nonresidents of Connecticut, that statute operated to deprive them of a significant amount of their money without due process of law.

We are aware, of course, of the special problems involved in determining the bona fide residence of college students who come from out of State to attend that State's public university. Our holding today should in no wise be taken to mean that Connecticut must classify the students in its university system as residents, for purposes of tuition and fees, just because they go to school there. Nor should our decision be construed to deny a State the right to impose on a student, as one element in demonstrating bona fide residence, a reasonable durational residency requirement, which can be met while in student status.[9] We fully recognize that a State

---

[8] Cf. *Carrington* v. *Rash, supra,* at 95–96; *Dunn* v. *Blumstein, supra,* at 349–352; *Shapiro* v. *Thompson, supra,* at 636.

[9] In *Starns* v. *Malkerson,* 326 F. Supp. 234 (Minn. 1970), the District Court upheld a regulation of the University of Minnesota

has a legitimate interest in protecting and preserving the quality of its colleges and universities and the right of its own bona fide residents to attend such institutions on a preferential tuition basis.

We hold only that a permanent irrebuttable presumption of nonresidence—the means adopted by Connecticut to preserve that legitimate interest—is violative of the Due Process Clause, because it provides no opportunity for students who applied from out of State to demonstrate that they have become bona fide Connecticut residents. The State can establish such reasonable criteria for in-state status as to make virtually certain that students who are not, in fact, bona fide residents of the State, but who have come there solely for educational

---

providing that no student could qualify as a resident for tuition purposes unless he had been a bona fide domiciliary of the State for at least a year immediately prior thereto. This Court affirmed summarily. 401 U. S. 985 (1971). Minnesota's one-year durational residency requirement, however, differed in an important respect from the permanent irrebuttable presumption at issue in the present case. Under the regulation involved in *Starns*, a student who applied to the University from out of State could rebut the presumption of nonresidency, after having lived in the State for one year, by presenting sufficient other evidence to show bona fide domicile within Minnesota. In other words, residence within the State for one year, whether or not in student status, was merely one element which Minnesota required to demonstrate bona fide domicile. By contrast, the Connecticut statute prevents a student who applied to the University from out of State, or within a year of living out of State, from ever rebutting the presumption of nonresidence during the entire time that he remains a student, no matter how long he has been a bona fide resident of the State for other purposes. Under Minnesota's durational residency requirement, a student could qualify for in-state rates by living within the State for a year in student status; whereas under Connecticut's scheme, a person who applied from out of State can never so qualify so long as he remains in student status. See also *Kirk* v. *Board of Regents of Univ. of California*, 273 Cal. App. 2d 430, 78 Cal. Rptr. 260 (1969), appeal dismissed, 396 U. S. 554 (1970).

purposes, cannot take advantage of the in-state rates. Indeed, as stated above, such criteria exist; and since § 126 was invalidated, Connecticut, through an official opinion of its Attorney General, has adopted one such reasonable standard for determining the residential status of a student. The Attorney General's opinion states:

"In reviewing a claim of in-state status, the issue becomes essentially one of domicile. In general, the domicile of an individual is his true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning. This general statement, however, is difficult of application. Each individual case must be decided on its own particular facts. In reviewing a claim, relevant criteria include year-round residence, voter registration, place of filing tax returns, property ownership, driver's license, car registration, marital status, vacation employment, etc." [10]

Because we hold that the permanent irrebuttable presumption of nonresidence created by subsections (a)(2), (a)(3), and (a)(5) of Conn. Gen. Stat. Rev. § 10–329 (b) (Supp. 1969), as amended by Public Act No. 5, § 126 (June Sess. 1971), violates the Due Process Clause of the Fourteenth Amendment, the judgment of the District Court is affirmed.

*It is so ordered.*

Mr. Justice Marshall, with whom Mr. Justice Brennan joins, concurring.

I join the opinion of the Court except insofar as it suggests that a State may impose a one-year residency

---

[10] Opinion of the Attorney General of the State of Connecticut Regarding Non-Resident Tuition, Sept. 6, 1972 (unreported).

requirement as a prerequisite to qualifying for in-state tuition benefits. See *ante,* at 452 and n. 9. That question is not presented by this case since here we deal with a permanent, irrebuttable presumption of nonresidency based on the fact that a student was a nonresident at the time he applied for admission to the state university system. I recognize that in *Starns* v. *Malkerson,* 401 U. S. 985 (1971), we summarily affirmed a district court decision sustaining a one-year residency requirement for receipt of in-state tuition benefits. But I now have serious question as to the validity of that summary decision in light of well-established principles, under the Equal Protection Clause of the Fourteenth Amendment, which limit the States' ability to set residency requirements for the receipt of rights and benefits bestowed on bona fide state residents. See *Dunn* v. *Blumstein,* 405 U. S. 330 (1972); *Shapiro* v. *Thompson,* 394 U. S. 618 (1969). Because the Court finds sufficient basis in the Due Process Clause of the Fourteenth Amendment to dispose of the constitutionality of the Connecticut statute here at issue, it has no occasion to address the serious equal protection questions raised by this and other tuition residency laws. In the absence of full consideration of those equal protection questions, I would leave the validity of a one-year residence requirement for a future case in which the issue is squarely presented.

In addition, I cannot agree with my Brother REHNQUIST's assertion in dissent that the Court's opinion today represents a return to the doctrine of substantive due process. This case involves only the validity of the conclusive presumption of nonresidency erected by the State, and, as such, concerns nothing more than the procedures by which the State determines whether or not a person is a resident for tuition purposes.

MR. JUSTICE WHITE, concurring in the judgment.

In *Starns* v. *Malkerson,* 401 U. S. 985 (1971), a regulation issued by the Board of Regents provided that no student could qualify for the lower, in-state tuition to the University of Minnesota until he had been a bona fide domiciliary of the State for one year. The District Court upheld the law, 326 F. Supp. 234 (Minn. 1970), and we affirmed summarily, although the effect of the Regents' regulation was to prevent an admitted Minnesota domiciliary from being treated as such for a period of one year. I thought the case warranted plenary treatment, but I did not then, nor do I now, disagree with the judgment. Because I have difficulty distinguishing, on due process grounds, whether deemed procedural or substantive or whether put in terms of conclusive presumptions, between the Minnesota one-year requirement and the Connecticut law that, for tuition purposes, does not permit Connecticut residence to be acquired while attending Connecticut schools, I cannot join the Court's opinion.

I concur in the judgment, however, because Connecticut, although it may legally discriminate between its residents and nonresidents for purposes of tuition, here invidiously discriminates among at least three classes of bona fide Connecticut residents. First, there are those unmarried students who have resided in Connecticut one year prior to application or who later reside in Connecticut for a year without going to school. They pay the substantially lower in-state tuition. Second, there are the married students who have a legal address in Connecticut at the time of application. They also pay the lower tuition, whether or not they have resided in Connecticut for a year prior to application. Third, there are the unmarried students whose legal address has been outside Connecticut at some time during the year prior to application but who later become legal residents of

Connecticut, before or after application or before or after matriculation, and remain such for at least one year. These students, although year-long residents, must continue to pay out-of-state tuition for as long as they are in school.

This discrimination between classes of bona fide residents of the State is sought to be justified, as I understand it, on the sole ground that too few students from out of State actually become Connecticut residents to require the State to sort out this small number by investigating the inevitably larger number of residency claims which would be submitted if the rule were otherwise but which for the most part would be bogus.

In *Bell* v. *Burson,* 402 U. S. 535 (1971), under the applicable state law a driver's license could not be revoked without proof of fault, but, upon the occurrence of an accident, the State automatically suspended the license without showing even probable fault and without an opportunity to prove nonfault. The State neither argued nor claimed that there was a more likely than not inference of fault from the mere event of an accident.

In *Carrington* v. *Rash,* 380 U. S. 89 (1965), the State refused those in active military service the opportunity to prove residence in the State and thus their eligibility to vote. The Court struck down this restriction. The State's interest in avoiding the task of verifying claims of residency was insufficiently weighty to warrant interference with the right to vote of the military personnel who had actually become domiciled in the State.

In *Stanley* v. *Illinois,* 405 U. S. 645 (1972), the state standard for separating child and parent was unfitness of parent. Accepting the State's argument that most unwed fathers are unfit, we nevertheless required the State to give those fathers a hearing on their fitness prior to depriving them of the custody of their children. It was administratively convenient for the State to pre-

sume unfitness and so avoid hearings to identify the perhaps smaller number of fit, unwed fathers; but this justification was found insufficient in view of the strong interest of a natural parent in the custody of his child, an interest that we thought came to this Court " 'with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' " *Id.,* at 651, quoting from *Kovacs* v. *Cooper,* 336 U. S. 77, 95 (1949) (Frankfurter, J., concurring). The unwed father's interest was at least cognizable and substantial enough to prohibit the State, in the name of administrative convenience, from denying the unwed father a hearing on parental fitness prior to declaring his child a ward of the State. The same considerations led us to conclude that the unwed father was denied equal protection of the laws.

From these and other cases, such as *Dandridge* v. *Williams,* 397 U. S. 471 (1970); *Reed* v. *Reed,* 404 U. S. 71 (1971); *Frontiero* v. *Richardson,* 411 U. S. 677 (1973); and *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972), it is clear that we employ not just one, or two, but, as my Brother MARSHALL has so ably demonstrated, a "spectrum of standards in reviewing discrimination allegedly violative of the Equal Protection Clause." *San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1, 98–99 (1973) (MARSHALL, J., dissenting). Sometimes we just say the claim is "invidious" and let the matter rest there, as MR. JUSTICE STEWART did, for example, in concurring in the judgment in *Frontiero.* But at other times we sustain the discrimination, if it is justifiable on any conceivable rational basis, or strike it down, unless sustained by some compelling interest of the State, as, for example, when a State imposes a discrimination that burdens or penalizes the exercise of a constitutional right. See, *e. g., Shapiro* v. *Thompson,* 394 U. S. 618 (1969). I am uncomfortable with the dichot-

omy, for it must now be obvious, or has been all along, that, as the Court's assessment of the weight and value of the individual interest escalates, the less likely it is that mere administrative convenience and avoidance of hearings or investigations will be sufficient to justify what otherwise would appear to be irrational discriminations.

Here, it is enough for me that the interest involved is that of obtaining a higher education, that the difference between in-state and out-of-state tuition is substantial, and that the State, without sufficient justification, imposes a one-year residency requirement on some students but not on others, and also refuses, no matter what the circumstances, to permit the requirement to be satisfied through bona fide residence while in school. It is plain enough that the State has only the most attenuated interest in terms of administrative convenience in maintaining this bizarre pattern of discrimination among those who must or must not pay a substantial tuition to the University. The discrimination imposed by the State is invidious and violates the Equal Protection Clause.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE REHNQUIST joins, dissenting.

I find myself unable to join the action taken today because the Court in this case strays from what seem to me sound and established constitutional principles in order to reach what it considers a just result in a particular case; this gives meaning to the ancient warning that "hard cases make bad law." The Court permits this "hard" case to make some very dubious law.

A state university today is an establishment with capital costs of many millions of dollars of investment. Its annual operating costs likewise may run into the millions. Parents and other taxpayers willingly carry this heavy burden because they believe in the values of higher education. It is not narrow provincialism for the State

to think that each State should carry its own educational burdens. Until we redefine our system of government—as we are free to do by constitutionally prescribed means—the States may restrict subsidized education to their own residents. This much the Court recognizes and it likewise recognizes that the statutory scheme under review reasonably tends to support that end.

Commendably, the Court has tried to cast the opinion in the narrowest possible terms, but it seems nonetheless to accomplish a transferrence of the elusive and arbitrary "compelling state interest" concept into the orbit of the Due Process Clause. The Court categorizes the Connecticut statutory classification as a "permanent and irrebuttable presumption"; it explains that this "presumption" leads to unseemly results in this and other isolated cases; and it relies upon the State's stopgap guidelines for determining bona fide residency to demonstrate that "the State has reasonable alternative means of making the crucial determination." This is the language of strict scrutiny. We ought not try to correct "unseemly results" of state statutes by resorting to constitutional adjudication.

Distressingly, the Court applies "strict scrutiny" and invalidates Connecticut's statutory scheme without explaining why the statute impairs a genuine constitutional interest truly worthy of the standard of close judicial scrutiny. The real issue here is not whether holes can be picked in the Connecticut scheme; of course, that is readily done with this "bad" statute. Whether we deal with statutes of Connecticut or of Congress, we can find flaws, gaps, and hard and unseemly results at times. But our function in constitutional adjudication is not to see whether there is some conceivably "less restrictive" alternative to the statutory classifications under review. The Court's task is to explain why the "strict scrutiny" test,

previously confined to other areas, should now in practical effect be read into the Due Process Clause. The drift of *Stanley* v. *Illinois,* 405 U. S. 645 (1972), on which the Court relies heavily, was to apply a similar test, but at least there the Court essayed to explain that the rights of fatherhood and family were regarded as " 'essential' " and " 'basic civil rights of man,' " *id.,* at 651, and to provide an analytic basis for the result reached. To the same effect was *Bell* v. *Burson,* 402 U. S. 535 (1971), where the Court noted that suspension of a driver's license might impair the pursuit of a livelihood, thereby infringing "important interests of the licensees." *Id.,* at 539. *Carrington* v. *Rash,* 380 U. S. 89 (1965), an equal protection case, involved deprivation of the right to vote, by the Court's, and MR. JUSTICE STEWART's own description, a matter "close to the core of our constitutional system." *Id.,* at 96.*

---

*Implicit in my dissenting vote, of course, is my disagreement with MR. JUSTICE WHITE's suggestion that the "weight and value" of the appellees' interest in obtaining a higher education require us to pay something less than the usual deference to the judgment of the Connecticut Legislature. If appellees' chances of securing higher education were truly in jeopardy as a result of the tuition differential at issue here, there would at least be an arguable basis for special concern, though for me the *San Antonio* case would provide a serious obstacle to any departure from the traditional "rational basis" test. In this case, there is, in any event, no allegation by either appellee that the higher out-of-state tuition charge does, will, or even may deprive her of the opportunity to attend the University of Connecticut. Thus, try as I may, I find it impossible to understand why the interest of appellees at issue here amounts to any more or any less than the number of dollars they are required to pay in excess of Connecticut's in-state tuition rate. That amount may be "substantial," but the Court has never suggested that financial impact, *per se,* requires abandonment of the "rational basis" test of equal protection review as MR. JUSTICE WHITE suggests. Indeed, I had always thought that a simple financial deprivation was the classic case for judicial deference to legislative choices.

There will be, I fear, some ground for a belief that the Court now engrafts the "close judicial scrutiny" test onto the Due Process Clause whenever we deal with something like "permanent irrebuttable presumptions." But literally thousands of state statutes create classifications permanent in duration, which are less than perfect, as all legislative classifications are, and might be improved on by individualized determinations so as to avoid the untoward results produced here due to the very unusual facts of this case. Both the anomaly present here and the arguable alternatives to it do not differ from those present when, for example, a State provides that a person may not be licensed to practice medicine or law unless he or she is a graduate of an accredited professional graduate school; a perfectly capable practitioner may as a consequence be barred "permanently and irrebuttably" from pursuing his calling, without ever having an opportunity to prove his personal skills. The doctrinal difficulties of the Equal Protection Clause are indeed trying, but today the Court makes an uncharted drift toward complications for the Due Process Clause comparable in scope and seriousness with those we are encountering in the equal protection area. Can this be what we are headed for?

The pressure of today's holding may well push the States to enact reciprocal statutes to the end that Connecticut will undertake to admit as "resident" students only those students from other States that give the same status to Connecticut residents. When a State allocates a large share of its resources to create and maintain a university whose quality is found attractive to many students from other States, its very success and stature may well operate to cripple it because then, not unnaturally, it will be flooded with applications from students from afar. Perhaps on less "high ground" students who favor winter sports will flock to the Northeast and

Northwest and the sun worshipers will head South. Is the Court willing to say that Connecticut may not grant partial scholarships to persons who have attended a Connecticut secondary school for—let us say—at least one full school year and then set nonresident tuition as it does now? We should not be surprised at the natural response of States which, having placed high value on universities, having developed great institutions at large cost, believe that other States should do the same and therefore seek ways to keep the institution in being for its own citizens. I do not suggest these things ought to be done or that they are desirable; rather, I submit, when we examine a statute of a State we should lay aside preferences for or against what the State does in a few particular or isolated cases and look only to what the Constitution forbids a State to do, so as to avoid putting pressure on the States to engage in legislative devices to escape from the hobbles we place on them on matters of purely state concern.

The urge to cure every disadvantage human beings can experience exerts an inexorable pressure to expand judicial doctrine. But that urge should not move the Court to erect standards that are unrealistic and indeed unexplained for evaluating the constitutionality of state statutes.

Mr. Justice Rehnquist, with whom The Chief Justice and Mr. Justice Douglas join, dissenting.

The Court's opinion relegates to the limbo of unconstitutionality a Connecticut law that requires higher tuition from those who come from out of State to attend its state universities than from those who come from within the State. The opinion accomplishes this result by a highly theoretical analysis that relies heavily on notions of substantive due process that have been authoritatively repudiated by subsequent decisions of the Court.

Believing as I do that the Connecticut statutory scheme is a constitutionally permissible means of dealing with an increasingly acute problem facing state systems of higher education, I dissent.

This country's system of higher education presently faces a serious crisis, produced in part by escalating costs of furnishing educational services and in part by sharply increased demands for those services. Because state systems have available to them state financial resources that are not available to private institutions, they may find it relatively easier to grapple with the financial aspect of this crisis. But for this very reason, States have generally felt that state resources should be devoted, at least in large part, to the education of children of the State's own residents, and that those who come from elsewhere to attend a state university should have to make a more substantial contribution toward the full costs of the education they would receive than the all but nominal tuition required of those who come from within the State.

One way to accomplish such a differentiation would be to make the tuition differential turn on whether or not the student was a "resident" or "nonresident" of the State at the time tuition is paid. The Court, at least by implication, concedes that such a differentiation would violate no command of the Constitution, but even a casual examination of how such a plan would operate indicates why it did not commend itself to the Connecticut Legislature. The very act of enrolling in a Connecticut university with the intention of completing a program of studies leading to a degree necessitates the physical presence of the student in the State of Connecticut. Additional indicia of residency, by which the Court apparently sets great store—obtaining a Connecticut motor vehicle registration or driver's license, registering to vote in Connecticut—impose no significant burden

on the out-of-state student in comparison with the thousands of dollars he will save in tuition and fees during the pursuit of a four-year course in undergraduate studies. Thus, what the Court concedes to the States in the way of distinguishing between resident and non-resident students, while perhaps a valuable bit of authority in issuing fishing and hunting licenses, is all but useless in making students who come from out of State pay even a portion of their fair share of the cost of the education that they seek to receive in Connecticut state universities.

The system to which Connecticut has turned is one that limits the virtually complete subsidy that is afforded to those who pay in-state tuition to those who resided in Connecticut at the time of applying for admission, and whose residence in Connecticut did not result from their desire to attend the state universities. Some such plan must be devised by any State that wishes to differentiate between those who have paid taxes to the State over a period of years in order to support the university, and those who have simply come to the State in order to attend the university. Since institutions of higher learning are not built in a year or in a decade, such a distinction strikes me as entirely rational, and I do not understand the Court to hold otherwise.

Understandably, any such general principle will have a number of specific applications, and just as understandably a capable lawyer will be able to focus on one or more of these specific applications that appear to diverge from the principle that the State is attempting to enforce. The Court's opinion deals with the situation of the particular litigants here involved, doubtless chosen with an eye to illustrating the Connecticut system at its worst, and with still other hypothetical examples upon which it expatiates during the course of its opinion. But the fact that a generally valid rule may

have rough edges around its perimeter does not make it unconstitutional under the Due Process Clause of the Fourteenth Amendment:

> "[T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 487–488 (1955).

Throughout the Court's opinion are found references to the "irrebuttable" presumption as to residency created by the Connecticut statutes. But a fair reading of these laws indicates that Connecticut has not chosen to define eligibility for a state-subsidized education in terms of "residency" at the moment that the applicant seeks admission to the university system, but instead has insisted that the applicant have some prior connection with the State of Connecticut independent of the desire to attend a state-supported university. Thus, it would not satisfy Connecticut's goals in seeking to subsidize the education of Connecticut's young people in Connecticut state universities to impose a classic residency test as of the moment of entry into the system of higher education. All students, and not only those with substantial Connecticut connections, will be present in Connecticut on this date, and those who have been astute enough to consult counsel will have obtained Connecticut drivers' licenses, registered their cars in Connecticut, and registered to vote in Connecticut.

Meaningful differentiation between children of families who have supported the state educational system by payment of taxes to the State of Connecticut, and children from families who have not done this, would be impossible if the test were residency as of the date of

admission, or the date on which tuition is due, at least as the Court enunciates such a test. But this is not what Connecticut tried to do, and, as I read the Court's opinion, Connecticut is not limited to the imposition of such an easily circumvented test. For the Court reaffirms *Starns* v. *Malkerson*, 326 F. Supp. 234 (Minn. 1970), aff'd, 401 U. S. 985 (1971), in which the State of Minnesota had by regulation provided that no student could qualify as a resident for tuition purposes unless he had been a bona fide domiciliary of the State for at least a year immediately prior thereto. A regulation such as Minnesota's enables the State partially to maintain the distinction that Connecticut has sought to protect here. The Court indicates that the critical distinction between the Minnesota regulation and the Connecticut statute is that the Minnesota regulation operated to fix nonresidency only for the first year of attendance at the university. But this supposed distinction merely highlights the error in the Court's approach to this entire problem. Minnesota was no more concerned during the first year than is Connecticut with "residency" as that term is used in other legal contexts. One who had his vehicle licensed in Minnesota, obtained a Minnesota driver's license, and registered to vote in Minnesota could make the same attack on the "irrebuttable" presumption of residency involved in *Starns* as these appellees do on the Connecticut statute. The Court's response is that while Minnesota's fixing of residency as of a date prior to application endured for only one year, Connecticut's endures for four years. This is admittedly a factual difference, but one may read the Court's opinion in vain to ascertain why it is a difference of constitutional significance.

The majority's reliance on cases such as *Heiner* v. *Donnan*, 285 U. S. 312 (1932), harks back to a day when the principles of substantive due process had reached

their zenith in this Court. Later and sounder cases thoroughly repudiated these principles in large part. Ten years ago, the Court reviewed these doctrines in *Ferguson v. Skrupa*, 372 U. S. 726, 730 (1963), and made the following observation:

> "The doctrine that prevailed in *Lochner, Coppage, Adkins, Burns*, and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. As this Court stated in a unanimous opinion in 1941, 'We are not concerned . . . with the wisdom, need, or appropriateness of the legislation.' "

The Court's highly abstract and theoretical analysis of this practical problem leads to a conclusion that is contrary to the teaching of *Ferguson, supra*.

The typical 18-year-old entering college as a freshman, doubtless typifying the largest group of entering students in Connecticut as elsewhere, has in most cases made little or no contribution by way of tax payment to the cost of his public higher education whether it be in Connecticut or elsewhere. More likely it is his parents, themselves long past college age, who have supported the state universities over a period of years with the thought that they would eventually realize some return from this involuntary investment in the form of in-state tuition for their own children who sought to attend a state university. The State of Connecticut has sought to allow this hope to be realized through the distinction that it has made between those who are to pay nominal tuition and those who are to pay the more substantial

out-of-state tuition. To the extent that today's decision requires students with no previous connection with the State of Connecticut to be admitted to that State's university system as in-state students, upon obtaining a driver's license and registering to vote, it means that longtime Connecticut residents will not only continue to support the state university system, but that they will be required to support it in increased measure in order to help subsidize the education of nonresidents. The Court's invalidation of the Connecticut plan is quite inconsistent with doctrines of substantive due process that have obtained in this Court for at least a decade, and to which I would continue to adhere.