The STATE of Ohio, Appellant,

v.

BREEZE, Appellee.

[Cite. as *State v. Breeze* (1993), 89 Ohio App.3d 464.]

Court of Appeals of Ohio,
Montgomery County.

No. 13834.

Decided Aug. 30, 1993.

*F. Jay Newberry,* for appellant.

*Eric Silverberg,* for appellee.

_____

FAIN, Judge.

Plaintiff-appellant, state of Ohio, appeals from a decision of the trial court granting a motion to suppress the results of a blood-alcohol test administered to defendant-appellee, M. Joyce Breeze. We conclude that the trial court did not err in holding that the state failed to prove that the Kettering Police Department ("KPD") complied with the requirements of Ohio Adm.Code 3701–53–02(C)(2)(e) before administering the breath test to Breeze.

I

Breeze was arrested for DUI on September 30, 1992. She submitted to a breath test on a BAC Datamaster resulting in a reading of 0.129 percent blood alcohol. She was then issued a citation for an alleged violation of R.C. 4511.-19(A)(3).

At an evidentiary hearing on a motion to suppress the test result, the state called one witness, Sergeant Michael Willcox of the KPD, who testified that the Datamaster was placed in service on June 19, 1992, after a radio frequency interference ("RFI") test of the machine was conducted. Willcox also testified that from June 25, 1992, until Breeze was tested on September 30, 1992, the Datamaster had not been moved in any direction more than one foot nor had the axis been permanently changed, and that the Datamaster was serviced on June 22 and July 2, 1992, both times by a factory technician who signed a work order containing preprinted language.

Willcox then explained that the July 2 service call resulted in replacement of the power supply unit, a check of voltages, and calibration. Willcox's testimony on the work order and its language was as follows:

"Q. And do you have with you in Court today, at my request, uh, the records of that BAC Datamaster?

"A. Yes I do.

" * * *

"Q. Did he, uh sign and fill out a repair order or repair work sheet?

"A. Yes he did.

"Q. And the signature that appears down at the bottom of that, whose is that, whose signature does that purport to be?

"A.   Uh, that's the factory technician for the manufacturer.

"Q.   And is there a certification on this work order as to what kind of components were utilized?

"A.   Yes there is.

" * * *

"Q.   Alright, let's go to the next repair date.   What is that?

"A.   This is on July 2nd, 1992.

"Q.   What was done?

"A.   Uh, replaced a power supply unit and checked again all voltages and calibration.

"Q.   And is that signed by the technician?

"A.   Yes sir, the factory technician same as the other repair.

" * * *

"Q.   And is there a certification as to what type of uh, parts were used?

"A.   Exactly the same certification as the previous one.

"Q.   Would you state it for the record?

"A.   It reads, and I quote, 'all replacement parts used are certified to be either specified original components or authorized replacement components unless otherwise indicated.   * * *'

"Q.   And is it otherwise indicated on either repair order?

"A.   No it is not."

On cross-examination, Willcox testified that (1) he was present during all repairs;   (2) the work order was a preprinted form signed by the factory technician;   (3) the Datamaster was moved during the service call;   (4) the movement of the Datamaster changed its axis;   and (5) no RFI survey was conducted after the July 2 service call.

The state produced no other witness besides Willcox and no further testimony on the Datamaster service.   The state did not enter any exhibits into evidence.

The trial court made the following finding of facts:

"1.   On June 22, 1992, and on July 2, 1992, repairs were made to the BAC Datamaster, and no new RFI survey was conducted following repairs of July 2, 1992, and before the BAC test administered to the Defendant on September 30, 1992;   2.   That the repairs in question required the repair person to move the machine forward approximately 4–5 inches, but that the machine was not physically removed from its location in the hallway of the City of Kettering Jail;

3. That the machine's axis was not changed as a result of said repairs; 4. That on June 22, 1992, the CPU unit was replaced and the voltage of the machine checked, and on July 2, 1992, the power supply unit was replaced, and the voltage and calibration were checked; 5. That no evidence was presented indicating that the replacement parts used were original equipment replacement parts meeting the same specifications as the original equipment parts."

The trial court then held that the replacement of the power supply unit on July 2, 1992 was a replacement of an electronic component of the Datamaster and that the state failed to prove "strict compliance" with Ohio Adm.Code 3701–53–02(C)(2)(e). The trial court also found that the state failed to show that noncompliance with the regulations did not affect the validity of the test. The trial court granted Breeze's motion to suppress.

From the decision of the trial court, the state has filed an appeal pursuant to Crim.R. 12(J).

## II

The state's first assignment of error is as follows:

"The trial court erred in granting defendant's motion to suppress her blood alcohol test results as no new RFI survey was required since the BAC Datamaster was returned to its original location after being repaired."

■ Ohio Adm.Code 3701–53–02(C)(2)(a) does not require a new RFI survey when the breath-testing device is moved for maintenance and repair of minor parts and then is returned to its original testing location. *State v. Yoder* (1993), 66 Ohio St.3d 515, 518, 613 N.E.2d 626, 629.

In *Yoder* the Ohio Supreme Court held that the requirements of Ohio Adm. Code 3701–53–02(C)(2)(a) were met where the breath-testing device was returned to its original location, with no allegation of any change in the machine's axis. *Id.* In the case before us, the trial court found that the axis was not changed and that the Datamaster was returned to its original location. Therefore, pursuant to *Yoder*, the state is correct in its assertion that the KPD complied with Ohio Adm.Code 3701–53–02(C)(2)(a) before giving Breeze her breath test.

In view of our disposition of the state's second assignment of error, we conclude that the error presented in the state's first assignment of error is harmless. Therefore, it is overruled.

## III

The state's second assignment of error is as follows:

"The trial court erred in determining that no evidence was presented to show that the parts replaced in the BAC Datamaster were original or factory authorized replacement parts."

■ The state's burden at a suppression hearing is preponderance of the evidence. *Athens v. Wolf* (1974), 38 Ohio St.2d 237, 67 O.O.2d 317, 313 N.E.2d 405. The Ohio Administrative Code does not require the state to conduct a new RFI survey when replacement components meet the specifications enumerated in Ohio Adm.Code 3701–53–02(C)(2)(e). *Yoder, supra,* 66 Ohio St.3d at 518, 613 N.E.2d at 629. This court has held that the state has the burden of proving strict compliance with the Ohio Administrative Code. *Fairborn v. Johnson* (Nov. 3, 1992), Greene App. No. 92CA23, unreported, 1992 WL 317400.

The Ohio Supreme Court has held that Evid.R. 803(8)[1] does not exclude as hearsay certified police log books containing reports of breath-testing equipment maintenance and calibration because "[s]uch routine records are highly likely to be reliable" and that Evid.R. 803(8) excludes only "the introduction of reports which recite an officer's observations of criminal activities or observations made as part of an investigation of criminal activities." *State v. Ward* (1984), 15 Ohio St.3d 355, 358, 15 OBR 477, 479, 474 N.E.2d 300, 302. In *Ward,* certified copies of police log books, showing that the breath-testing equipment was properly calibrated, were entered into evidence. However, the court was not required to consider the difference between the "likely" reliability of maintenance reports kept by police and the reliability of statements made by nonpublic officials appearing in those reports.

The issue here is whether the state proved strict compliance at the suppression hearing. We find that the state failed to authenticate or identify the work order as a public record, and failed to qualify the hearsay statement (in the work order relied on by the state) as a public records exception to the hearsay rule under Evid.R. 803(8).

■ As a preliminary matter, we do not decide that the state must resort to expert testimony or overly elaborate means of identifying and authenticating documents showing repair histories of breath-testing equipment. Instead, the state may prove compliance with Ohio Adm.Code 3701–53–02(C)(2)(e) by authenticating and entering into evidence technical documentation from the manufactur-

---

1. Evid.R. 803(8) provides:

"Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness."

er, showing specifications and part numbers of original and factory-authorized replacement parts, and by producing a witness who (1) has personal knowledge of the part number of the electronic components replaced during the service call; or (2) can read from a certified police log book or other authenticated public record the date of the service call and the part number and description of the replacement part. The manufacturer's technical documentation should include a list of replacement parts meeting factory specifications, the actual specifications of original parts, and the specifications of the replacement part, along with identifying information such as part numbers and/or photographs of the replacement part, and original parts where part numbers are unavailable.

The general rule is that the foundational conditions for evidence introduced pursuant to Evid.R. 803(8) are minimal, and do not require the testimony of a custodian or other qualified witness as a precondition to admissibility; however, where the focus of the report is on facts and circumstances external to the public agency, qualification should be under Evid.R. 803(8)(b). 1 Weissenburger's Ohio Evidence (1993) 86 and 90, Sections 803.104–105. Here, the preprinted statement's focus was on technical facts external to the activities of the KPD. Therefore, the work order should be authenticated under Evid.R. 803(8)(b). This is so despite the fact that police log books are generally admissible under Evid.R. 803(8)(a).

Generally, a certificate of authenticity must accompany the police log book. *State v. Goeckerman* (Oct. 21, 1988), Ottawa App. No. OT887, unreported, 1988 WL 110296. Data created by a secondary (nonpublic agency) source and placed into a police file is not automatically converted into a public record for purposes of the hearsay exception in Evid.R. 803(8). See, *State v. Vogelsong* (1992), 82 Ohio App.3d 354, 612 N.E.2d 462. In *Vogelsong* an electronic file was held inadmissible under Evid.R. 803(8) where the file was accessed but not stored at the police office and where the witness could not verify the information's accuracy or method of input. Under Evid.R. 803(8), authentication or identification of the document as a public record or report is still required by Evid.R. 901. *State v. Robles* (1989), 65 Ohio App.3d 104, 110, 583 N.E.2d 318, 321. Such a report may be self-authenticating, but it is necessary that the report itself be offered into evidence and that it contain, on its face, authenticating or identifying information. *Id.*

Although the police records are admissible after authentication, statements within police records, made by nongovernmental agents, require a greater foundation. The foundational requirements for admission of official records pursuant to Evid.R. 803(8)(b) require that (1) a government employee or agent who is the source of the information must have personal knowledge of the event

or condition described in the report; (2) the source must be under a legal duty to report the information; and (3) the official agency must be legally required to prepare and maintain the report. 1 Weissenberger's Ohio Evidence (1993) 92, Section 803.106. The requirements are even greater when the official records contain multiple hearsay, since each successive hearsay statement must conform to a hearsay exception in order to be admissible.

In another case involving maintenance records, the replacement of an electronic component, and preprinted language in a work order, the Ninth District Court of Appeals held that the language in two reports was admissible under the public records and reports exception to the hearsay rule in Evid.R. 803(8). *State v. Lambert* (Nov. 27, 1991), Summit App. No. 15141, unreported, 1991 WL 260225. In *Lambert*, a police officer testified that she received the reports after the breath-testing machine had been returned upon completion of repairs. The trial court found that although the evidence showed that the repairs involved replacement of electronic components, the police department met all the required duties set forth in the Ohio Administrative Code for the use of the breath-testing equipment.

The state argues here that the work order's assertion is admissible pursuant to *Ward* and *Lambert*. We disagree. *Ward* and *Lambert* are distinguishable from the case before us. Neither *Ward* nor *Lambert* addresses the same admissibility issue as the case before us. In *Ward*, the court did not address the reliability of the statement of a nonpublic official made in a public record. In *Lambert*, the court did not expressly find that the factory-authorized replacement part met the same specifications as original parts.

In 1993, more than a year after *Lambert* was decided, the Ohio Supreme Court restated Ohio Adm.Code 3701–53–02(C)(2)(e) as "requir[ing] a new survey when an electronic component, other than original replacement parts or factory authorized parts *meeting the same specifications* as the original equipment parts, is replaced." *Yoder supra*, 66 Ohio St.3d at 518, 613 N.E.2d at 629. (Emphasis added.) Under *Yoder*,[2] the state must fully comply with the literal requirements of Ohio Adm.Code 3701–53–02(C)(2)(e).

The *Yoder* decision modifies *Lambert* to the extent that the *Lambert* opinion did not consider the necessity for literal compliance with the Ohio Administrative Code. We conclude that compliance with the Ohio Administrative Code should not be presumed, and we decline to find the kind of presumption the state favors—that every preprinted statement in a document placed in a public

---

2. The breath-testing machine's replacement parts in *Yoder* were not electronic components—the replacement parts were a breath lamp and a pressure switch—and the parties stipulated that the replacement parts were either original equipment or factory-authorized. *Id.*

agency's file is true. Such presumptions resemble those that are traditionally disfavored—under the Fifth and Fourteenth Amendment Due Process Clauses of the federal Constitution—where the presumption of universality is suspect and where the state has reasonable alternative means of proof. *Vlandis v. Kline* (1973), 412 U.S. 441, 446, 452, 93 S.Ct. 2230, 2230, 2236, 37 L.Ed.2d 63, 68, 71–72.

We also conclude that justice requires vigilance against the seductive force of overly simplistic presumptions when automation plays a substantial role in a criminal action involving a *per se* offense; not because of machine fallibility, but because of the considerable potential for unintentional human error in calibrating, operating, and maintaining complex equipment, and the further ease of misconstruing esoteric terminology when a technological matter comes before the court for an evidentiary ruling. The Ohio Supreme Court has recognized as much in observing "that a person charged with a violation under R.C. 4511.19 faces serious consequences solely dependent upon the results of a chemical test conducted by an instrument installed, controlled, maintained, regulated, checked and guarded by the state's law enforcement agencies." *Yoder, supra,* 66 Ohio St.3d at 518, 613 N.E.2d at 629. In finding that "[w]e cannot undercut the department's rulemaking authority by requiring a new RFI test when the regulation does not require one," the court in *Yoder* found that "we may not substitute our judgment for that of the Director of Health." *Yoder* at 518, 613 N.E.2d at 629.

Likewise, compliance with the Director of Health's procedures for achieving accurate results from breath-testing devices must not be presumed by the trial court. Under *Yoder*, a failure to comply with the literal requirements of Ohio Adm.Code 3701–53–02(C)(2)(e) requires the suppression of breath-test results.

Here, the state had Willcox read a portion of the work order into the record after acknowledging that he had brought to the hearing "the records of that BAC Datamaster." No official police records or any other exhibit was offered by the state for authentication or as proof of compliance with the Ohio Administrative Code.

Because the work order statement was inadmissible for lack of a proper foundation or qualification under a hearsay exception, the trial court did not err in finding that the state produced no evidence showing compliance.

Even if the preprinted statement were properly authenticated and entered into evidence for the truth of its assertion, the assertion that the replacement parts are either original or factory-authorized stops short of stating that the part replaced in the Datamaster prior to Breeze's breath test met the same specifications as an original part.

The state implicitly argues that Willcox's testimony "as to the certification of replacement parts" sufficiently shows compliance with the Ohio Administrative Code. We disagree. The preprinted statement, read into testimony by Willcox, alleged that "either factory specified original components or authorized replacement components" were used. That testimony did not show that the power unit replacement met the same specifications as a factory-specified original component, as required by Ohio Adm.Code 3701–53–02(C)(2)(e), which provides, in pertinent part:

"(2) A new RFI survey shall be conducted when: * * * * (e) Any electronic component of the instrument is changed, other than replacement parts with original equipment replacement parts or *factory authorized replacement parts meeting the same specifications as the original equipment parts*[.]" (Emphasis added.)

The state apparently interprets the phrase, "factory authorized," in the work order, to mean that all factory-authorized parts automatically meet the same specifications as original parts. However, this interpretation ignores the restrictive clause, "meeting the same specifications as the original equipment parts."

The state's second assignment of error is overruled.

## IV

Both of the state's assignments of error having been overruled, the judgment of the trial court is affirmed.

*Judgment affirmed.*

BROGAN and WOLFF, JJ., concur.