IN THE MATTER OF DAVID E. EVRARD, JUDGE OF THE PERRY CIRCUIT COURT.

[No. 1172S154. Filed August 22, 1975; amended first page filed September 3, 1975.]

*John Bunner*, of Evansville, for respondent.

*David V. Miller*, Special Prosecutor, of Evansville, for petitioner.

DEBRULER, J.—This original action was presented to this Court by a Petition for Removal of the respondent Judge of the Perry Circuit Court. This Court assumed jurisdiction of the case under authority vested in this Court by Art. 7, of the Indiana Constitution. Following our acceptance of the case, respondent challenged our jurisdiction. In *In re Evrard* (1974), 263 Ind. 423, 317 N.E.2d 841, this Court rejected that challenge and appointed a judge pro tempore of the Perry Circuit Court to serve until final resolution of the case. The Court also appointed a successor hearing officer and a special prosecutor to serve in the case. On January 30, 1975, respondent filed a response to the Petition for Removal.

The successor hearing officer, the Honorable Saul I. Rabb, conducted a hearing upon the petition and filed his special Findings of Fact with us on March 7, 1975. Respondent addressed several motions to this Court, which we deem unnecessary to rule upon in light of the decision we make today.

The Petition for Removal is based in part upon alleged violations of the election laws, occurring in the season of the 1970 Primary Election at which respondent was a candidate. The first charge is that respondent filed a declaration of candidacy for the office of Judge of the Perry Circuit Court with the Clerk of the Perry Circuit Court on March 7, 1970, and with the Secretary of State on March 16, 1970, in which he knowingly made the false statement that he was a qualified voter and resident of Perry County, Indiana, in violation of Ind. Code § 3-1-32-48, being Burns § 29-5948.[1]

The second charge is that respondent unlawfully voted, and aided and abetted his wife in unlawfully voting, in the Primary Election on May 5, 1970, in that at the time of the Primary Election respondent and his wife were legal residents of the State of Virginia, in violation of Ind. Code § 3-1-32-10, being Burns § 29-5910,[2] and Ind. Code § 35-1-29-1, being Burns § 9-102.[3]

The third charge is that on May 5, 1970, respondent passed from, and aided his wife in passing from, the State of Virginia into the State of Indiana, and voted in the May 5th Election,

---

1. "Any person who shall . . . file any declaration of candidacy, certificate or petition of nomination, knowing the same, or any part thereof, to be falsely made . . . shall be deemed guilty of a felony."

2. "Whoever, not having the legal qualifications of a voter who is duly registered and authorized to vote as he represents himself to be, or whoever falsely represents himself as a voter at any election authorized by law to be held in this state for any office whatever, votes or offers to vote at such election, shall be guilty of a felony."

3. "Every person who shall aid or abet in the commission of a felony . . . may be . . . convicted in the same manner as if he were a principal . . . and, upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal."

while neither was a bona fide resident of the voting precinct, in violation of Ind. Code § 3-1-32-13, being Burns § 29-5913.[4]

The fourth charge is that respondent conspired with his father, Fred J. Evrard, for the purposes of committing the three offenses enumerated above, in violation of Ind. Code § 35-1-111-1, being Burns § 10-1101.[5]

The substance of petitioners' case is that respondent had no legal residence in Perry County at the time he filed his sworn declaration of candidacy, and that neither respondent nor his wife had legal residences in that county at the time they voted on May 5, 1970. It was petitioners' belief that at said times, both were residents of the State of Virginia. It is a fact that both respondent and his wife registered to vote on March 7, 1970, in Perry County, and it therefore follows that both were registered to vote on the date respondent filed his declaration and on the date both voted in the Primary. There is no allegation made in this case that respondent did establish a legal residence in Perry County prior to the Primary, but that such residence was insufficient in duration to qualify as a legal residence for candidacy and voting purposes. Rather, petitioners contend that no residence at all was established by respondent and his wife prior to the Primary Election. We accept this posture of the case and do not consider the requirements of the law, if any there be, that pre-primary residence be of any particular duration. If respondent and his wife had a bona fide residence at the date of filing the declaration and voting, then those acts would not be unlawful. If, on the other hand, respondent and his wife did not

---

4. "Whoever passes from any other state into this state, and votes or attempts to vote at any voting precinct or ward of this state, not being at the time a bona fide resident of such voting precinct or ward, shall be guilty of a felony."

5. "Any person or persons who shall unite or combine with any other person or persons for the purpose of committing a felony, within or without this state; or any person or persons who shall knowingly unite with any person or persons, body, association or combination of persons, whose object is the commission of a felony or felonies, within or without this state, shall, on conviction, be fined not less than twenty-five dollars nor more than five thousand dollars, and imprisoned in the state prison not less than two years nor more than fourteen years."

have a bona fide residence on those dates, his acts would have involved false statements, and the existence of such statements would give considerable support to petitioners' contention that this Court should subject respondent to disciplinary action. Upon these assumptions, we proceed to consider this case.

In *Pedigo* v. *Grimes*, (1887) 113 Ind. 148, this Court considered the legal requirements for establishing a voting residence. The law requires that the person definitely intend to make a particular place his permanent residence and act upon that intention in good faith. The person must show to the court evidence of acts undertaken in furtherance of the requisite intent, which make that intent manifest and believable. Whether or not a person meets the residency requirement for voting is a contextual determination to be made by a court upon a consideration of the individual facts of any case. While one is probably limited to having a single residence for voting purposes at any given time, the fact that he has more than one "residence," or place of abode, in which he has substantial investment, social commitment, and interest, and which is useful for any number of purposes, is only one relevant fact among many others to be considered by a court. *Brownlee* v. *Duguid*, (1931) 93 Ind. App. 266, 178 N.E. 174. Conduct such as the abandonment of a prior residence and contemporary statements of intention to establish a new principal residence are to be considered also. *Brittenham* v. *Robinson et al.*, (1897) 18 Ind. App. 502.

In the late Fall of 1969, the then incumbent Judge of the Perry Circuit Court announced his intention to resign his judgeship effective January 1, 1970. During Thanksgiving and Christmas visits to Tell City, respondent was asked to run for the judgeship at the next General Election. He discussed this matter with friends and Democratic Party officials and, early in January, 1970, decided to run for the office. He immediately discussed the purchase of a house in Tell City with a realtor and asked the realtor to look for a house for him to buy. On February 10, 1970, respondent publicly an-

nounced his candidacy for the office of Judge and his intention to return permanently to Perry County. Both respondent and his wife registered to vote in Perry County on March 7, 1970, claiming 914 Eleventh Street, Tell City, as their residence. On March 11, 1970, respondent signed the declaration of candidacy under oath, and, on March 16, 1970, he filed it with the Secretary of State of Indiana.

Respondent and his wife returned periodically to Tell City during the months of January, February, March and May, 1970. In April, respondent obtained an estimate of the cost of moving his furniture to Tell City. In that same month, he resigned as patent attorney at the U.S. Department of Justice, but was offered and assumed a contractual relation with that Department from April, 1970 to July, 1970, for the purpose of winding up his work.

At an earlier time, in the year 1965, respondent had purchased an airplane and his visits to Tell City had become more frequent. This airplane and a newer airplane which was purchased in 1967, had been registered with the FAA giving the address of the respondent at Tell City. From 1954, when he graduated from Purdue through July, 1970, at which time he completed his move to Perry County, respondent was absent from the State of Indiana by reason of his military service and his employment with the U.S. Government. Respondent and his wife traveled from Virginia to Tell City on May 3, 1970, and voted on May 5th.

Most of the foregoing facts tend to support the formation of an intent to establish a residence in Tell City at the times relevant here, coupled with acts in furtherance thereof. The respondent made several public statements and commitments to run for office, which clearly were an expression of an intent to establish a residence in Tell City at the home of his parents. These statements did not stand alone. He took overt steps to sever his connections in Virginia and Washington, D.C., and to move to Tell City. On the other hand, the evidence also established that respondent owned a

house in Virginia and that his new wife's children were in school there and that the cars and driver's licenses of both respondent and his wife reflected their residence in Virginia, even up to the time of the Primary Election. We believe, however, that respondent's position was that he had substantial commitments and responsibilities in Virginia and Washington, D.C., as a lawyer, step-father, husband, homeowner, pilot and driver at the time he decided to become a candidate for Judge in Perry County and to establish a residence there. To require a person in respondent's position to have sold his house in Virginia and acquired one in Tell City, given up his employment abruptly and entirely, moved his wife's children from their school to Indiana, obtained an Indiana driver's license, and accomplished all such other odds and ends as would have severed completely all connections with Virginia and the Washington area, as a condition of establishing a residence in Indiana, would be unreasonable. No such absolute assurance of a voter's township and precinct residence is required to protect the integrity of the election process. Here the evidence shows without question that respondent formed the intent to establish a residence with his parents until he could sell his house in Virginia and buy another one in Perry County. The fact that the residence with his parents was intended to be for a limited period only is not decisive. *Pedigo* v. *Grimes, supra.* Both respondent and his wife were bodily present at that place periodically during the months of January, February, March and May. Both conducted themselves in Indiana and Virginia in a manner consistent with their expressed intent to move to Perry County. The steps which they took were sufficient to establish a residence at the home of his parents and to qualify them to register, declare candidacy, and vote in the Primary Election. No false statement is therefore shown to have been made in the declaration of candidacy or to be implied from the act of voting, as respondent had registered to vote and had established a residence at the home of his parents in Tell City.

Upon consideration of the charge that respondent aided and abetted his wife in violating the election laws in the manner described above, we find that the same legal test of residence should be applied to determining whether or not respondent's wife established a voting residence at the home of her husband's parents. It would appear to us that Margaret Evrard had the right to choose to adopt the voting residence of her husband. By reason of this voluntary choice and her marriage to respondent, she was entitled to claim the benefit of his connections with his parents' home. We therefore find that the evidence is insufficient to support any conclusion that respondent aided and abetted his wife in unlawfully violating the election law or conspired with his father to so violate the law.

The final part of the Petition for Removal is based upon the allegation that respondent unlawfully aided and abetted his wife, Margaret, in the commission of the felony of Bigamy, as defined in Ind. Code § 35-1-81-1, being Burns § 10-4204:

> "Whoever, being married, marries again, the former husband or wife being alive, and the bond of matrimony still undissolved, and no legal presumption of death having arisen, is guilty of bigamy. . . ."

The facts relating to this charge show that on December 29, 1969, respondent married Margaret Buckler. At that time Margaret Buckler had a living husband from whom she was not divorced. She had been informed from some unspecified source that her husband had been killed or had died in Vietnam. After the marriage, she learned that her husband was in fact living. She thereupon secured a divorce from him, and she and respondent were remarried.

The hearing officer found that respondent had no knowledge at the time of his marriage that Margaret's husband was still living. He had been told by her that her husband was dead, and, according to the findings of fact, he believed that he was dead, although he did nothing to verify the information she had given him. Under these facts,

we cannot conclude that respondent acted unlawfully when he married Margaret on December 29, 1969.

The appointment of the judge pro tempore for the Perry Circuit Court is hereby ordered terminated, and David E. Evrard is hereby authorized and instructed to reassume the functions and duties as regular Judge of the Perry Circuit Court.

Givan, C.J., and Prentice, J., concur; Hunter, J., dissents with opinion to follow; Arterburn, J., not participating.

### DISSENTING OPINION

HUNTER, J.—I dissent. The lengthy record in this matter, upon careful review in its entirety, sustains the charges against respondent. The facts disclosed in this dissent are set out verbatim from the record, so that the conclusions drawn herein may be compared with those drawn by the majority. This Court has been repeatedly harassed by outsiders since its appointment of a judge pro tempore in this matter last November. While such pressure is to be expected, it is no excuse for a less than complete review of the entire record, which, of course, takes a great deal of time and creates additional pressures until a decision is finally reached.

The responsibilities of this Court in maintaining and policing the judiciary deserve no less attention than we devote to civil and criminal appeals.

### I.

The first charge is that respondent filed a declaration of candidacy for the office of Judge of the Perry Circuit Court with the Clerk of the Perry Circuit Court on March 7, 1970, and with the Secretary of State on March 16, 1970, in violation of Ind. Code § 3-1-32-48, Burns § 29-5948 (1969 Repl.), which provides in pertinent part:

> "Any person who shall . . . file any declaration of candidacy, . . . knowing the same, or any part thereof, to be falsely made . . . shall be deemed guilty of a felony."

The essence of the crime of filing a false declaration of candidacy is the false swearing and filing of any of the averments required by Ind. Code § 3-1-9-5, Burns § 29-3605 (Code Ed.) [hereinafter declaration of candidacy statute], which provides:

> *"Candidates — Declarations — Form — Place of filing — Receipt showing filing—Filing by mail—Disqualification as candidate for other pecuniary office.*—The name of no candidate shall be printed upon an official ballot used at any primary election, unless at least forty [40] days and not more than seventy [70] calendar days prior to such primary, a declaration, subscribed and sworn to before a notary public or other person authorized to administer oaths, shall have been filed with the secretary of state in the case of a candidate for representative in the congress of the United States, member of the general assembly of the state of Indiana, judge of a circuit, superior, probate, criminal or juvenile court, and prosecuting attorney; with the clerk of the circuit court in the case of a candidate for clerk of the circuit court, county auditor, county treasurer, county recorder, county sheriff, county coroner, county surveyor, county assessor, county commissioner, county councilman, township trustee, township assessor, justice of the peace, constable, members of the township advisory board and members of the county committee of the political parties coming under the provisions of the primary law; with the clerk of the circuit court in the case of a city office, including judge of the city court, by the candidate in substantially the following form:

> ## "DECLARATION OF CANDIDACY
>
> "County of ——————————⎤
>                         ⎬ ss:
> State of Indiana          ⎦
>
> "I, ——————————————————————, the under-
>       (Name must be printed or typewritten)
> signed, do hereby certify that I am a *qualified* voter of
> —————— precinct of the Township of ——————,
> or of the —————— ward of the City or Town of ——————,
> County of ————, State of Indiana, and *reside* at
> ————————————; that I am a *member* of the ——————
> (Complete residence address must be inserted)
>
> party; and request that you place my name on the official primary ballot of said party to be voted on for the office

of —————— at the primary election to be held the ————— day of ——————, 19———.

"Subscribed and sworn to before me this —————— day of ——————, ——————

My Commission Expires: _____

_____

(Hour and Date) Filed in the office of ———— at ———— P.M./A.M. local time this —————— day of ——————, 19———.

"Not more than one [1] day after a declaration shall have been filed in the office of the secretary of state or the clerk of the circuit court of the county, the secretary of state or the clerk of the circuit court, as the case may be, shall mail to such candidate who shall have filed a declaration of candidacy, to the address set out in such declaration, a statement showing that such candidate has filed a declaration, the name of the candidate, the office for which he is a candidate, and the date on which such declaration was filed. No declaration of candidacy shall be made by telegraph. Declaration of candidacy may be made by mail and shall be considered filed as of the date and hour it is received in the office of the secretary of state or the clerk of the circuit court, as the case may be.

"No declaration of candidacy shall be valid unless filed with or received in the office of the secretary of state or the clerk of the circuit court by 12 o'clock noon local time of the fortieth calendar day prior to a primary election. Immediately after the deadline for filing the clerk of a circuit court and secretary of state shall certify and release to the public: (1) a list of the candidates for each office for each political party and (2) a list of all declarations of candidacy whose legality or validity is questioned. All questions concerning the legality or validity of a declaration of candidacy made to the clerk of the circuit court shall be referred to and determined by the county election board and all questions concerning the legality of [or] validity of a declaration made to the secretary of state shall be referred to and determined by the state election board.

"Any person who executes and files a declaration of candidacy for any office for which a per diem or salary is provided for by law shall be disqualified from filing a declaration of candidacy for any other office for which a per diem or salary is provided for by law until such original declaration of candidacy is withdrawn.

"No candidate shall be qualified to run for any public office unless he resides within the jurisdiction of the office for which he is running. The residency of the candidate shall be determined by the secretary of state or the clerk of the circuit court by the standards established by IC 1971, 3-1-21-3, as amended by Acts 1971, P.L. 11, section 9." [Emphasis added.]

An analysis of the declaration of candidacy statute shows that three material averments must be made by the candidate. First, the candidate must swear that he is a qualified voter. Secondly, he must swear to his residence. Finally, he must swear to his party membership. The allegations contained in the first charge relate to the first two averments; there is no question that respondent truly was a member of the Democratic Party.

## WAS RESPONDENT A QUALIFIED VOTER?

1. *Statement on the Law.*

To be a qualified voter, one must meet the age, citizenship and residency requirements of Ind. Code § 3-1-7-26, Burns § 29-3426 (Code Ed. Supp. 1974), [hereinafter cited as voter qualification statute], which provides:

"Every person who will be at least eighteen [18] years of age at the next ensuing general or city election, who is a citizen of the United States, who, if he continues to reside in the precinct until the next following general or city election, will at that time, have resided *in the state of Indiana six [6] months,* in the township sixty [60] days and the precinct thirty [30] days, shall be entitled, upon proper application, to be registered in such precinct." [Emphasis added.]

This statute must be read without the italized language, for it has been declared unconstitutional. *Affeldt* v. *Whitcomb,* (1970) 319 F. Supp. 69, aff'd mem. 405 U.S. 1034, 92 S. Ct. 1304, 31 L. Ed. 2d 576 (1972).

Under the voter qualification statute, respondent met the citizenship and age requirements. Thus, respondent would be a qualified voter for purposes of the declaration of candi-

dacy statute if he also met the residence requirement of the voter qualification statute.

"Residence" as that term is used in our voting laws means domicil. Perhaps unfortunately, the terms have been used interchangeably in Indiana case law. Thus, in *Yonkey* v. *State ex rel. Cornelison*, (1866) 27 Ind. 236, 245-50, we find the following statement:

> "But, from the evidence in the case, we think it too clear to admit of controversy, that *Yonkey*, in going to *Washington*, under the circumstances and for the purposes shown in evidence, did not lose his residence in Clinton county, or 'cease to reside' therein as alleged. As a general rule, where a man is the head of a family and is a house keeper, the domicil of the family is presumed to be his legal place of residence. It requires an intention in order to change the domicil, and therefore if a person leaves his place of residence temporarily, on business or otherwise, but with the intention of returning, he does not thereby lose his domicil, as he could not by such absence acquire one elsewhere. See Bouvier's Law Dic., title 'Domicil,' and authorities cited. Here, *Yonkey* resided with his family in *Clinton* county, and his family continued to reside there. It was his residence, and in going to *Washington* it is evident that he did not intend to lose his residence in *Clinton* county or change it to *Washington*. He therefore continued to reside in *Clinton* county."

Ordinarily, residence simply connotes the place where a person lives. In this sense, a person may have more than one residence; i.e., he may have a summer home in Indiana, and a winter home in Florida. As that term is employed in the voting laws, however, the mere fact that one has a residence in Indiana does not ipso facto mean that such person's domicil or legal home—his "residence"—is in Indiana so that he may exercise the right of franchise or become an office-seeker. Thus, it must be kept in mind that the term "resident" as it appears in our voting laws is a word of art, which represents the legal conclusion of domicil. The significance of such distinction is that while one may have several residences, he may have only one domicil. RESTATEMENT OF CONFLICTS § 11 (1934). In the following discussion, I will use

the terms "resident" and "residence," because those are the terms appearing in both the statutes and the case law; however, the precise legal issue is respondent's domicil.

In determining residence, there are constitutional, statutory and case law guidelines to be applied. I have no disagreement with the majority's restatement of *Pedigo* v. *Grimes,* (1887) 113 Ind. 148, 13 N.E. 700, that residence is established when a ". . . person definitely intend[s] to make a particular place his permanent residence and act[s] upon that intention in good faith," although such restatement appears a little broad.

The portions of *Pedigo* from which the legal standard was gleaned states:

"We can not, therefore, disturb the decision of the court, unless the testimony clearly shows that the persons who were asked to state for whom they voted cast illegal votes. This the testimony does not show. Taking the view of the testimony most favorable to the appellant, the utmost that can be said of it is, that the voters entered the State University at Bloomington without at the time of entering having formed a definite intention of making that place their residence, but that they did subsequently determine that it should be their residence. This gave them the right to vote, because there is no evidence that this was not their intention, formed and acted upon in good faith. We think it clear, that if they had gone to Bloomington with the intention of remaining simply as students, and there was no change of intention, they would not have acquired a residence. *Granby* v. *Amherst,* 7 Mass. 1; *Fry's Election Case,* 71 Pa. St. 302 (10 Am. R. 698; *Dale* v. *Irwin,* 78 Ill. 170; *Vanderpoel* v. *O'Hanlon,* 53 Iowa 246.

"Where, however, the intention is formed to make the college town the place of residence, and that place is selected as the domicile, then the person who does this in good faith becomes a qualified voter.

\* \* \*

"It can, we conceive, make no difference that the person is a student, if he has in good faith elected to make the place where the college is located his residence, since there is no imaginable reason why a person may not be both a student at a college and a resident of the place where the college is situated. If he is at the place merely as a student,

then he is not a resident; but if he has selected that place as his abode, he acquires a residence which entitles him to vote, if he possesses the other qualifications.

\* \* \*

". . . In this instance, the citizens, having taken up a residence in Bloomington and having no other home, were entitled to vote there, although they may not have intended to remain there always. It is frequently said in the books that a man must have a home somewhere, and it is agreed that this home is at the place where he is bodily present with the intention of making it his domicile, although he may have in view a change of residence at some future time. Cooley Const. Lim., 754; McCrary Elections, section 39."

A similar formulation of residence may be found in *Green* v. *Simon,* (1896) 17 Ind. App. 360, 367, 46 N.E. 693, 695:

"The general rule is, that a man can have but one place of residence, and that, to lose his residence in one place, he must acquire residence in another place. Personal presence alone at another place does not determine the matter. He must remove without the intention of returning to his home as such. He must remove to another place with the intent to make it his home. See *Culbertson* v. *Board, etc.,* 52 Ind. 361, and cases cited; *Astley* v. *Capron, supra; Moore* v. *Dunning,* 29 Ill. 130." See also, *Brendel* v. *Kugler,* (1951) 122 Ind. App. 104, 101 N.E.2d 661; *Brownlee* v. *Duguid,* (1931) 93 Ind. App. 266, 178 N.E. 174; *Petty* v. *Petty,* (1908) 42 Ind. App. 443, 85 N.E. 995; *Brittenham* v. *Robinson,* (1897) 18 Ind. App. 502, 48 N.E. 616.

And finally, in *State ex rel. White* v. *Scott,* (1908) 171 Ind. 349, 358-59, 86 N.E. 409, 412-13, we find the following summary:

"The question of residence is largely one of intention. A mere intention, however, to change from one place to another, is not sufficient. To effectuate a change of residence the intent to remove must be unequivocally formed, and a fixed settlement at another place resolved upon, and either accomplished or its establishment entered upon, with no present intention of returning to the former place, or of departing from the latter. Intention and action must coexist. *Pedigo* v. *Grimes,* (1888) 113 Ind. 148, 152, and authorities cited; *Culbertson* v. *Board, etc.,* (1876) 52 Ind. 361; *Green* v. *Simon,* (1897), 17 Ind. App. 360. See, also,

*Fry's Election Case,* (1872) 71 Pa. St. 302, 10 Am. Rep. 698. We said in a recent case that 'a purpose to change such residence, unaccompanied by actual removal or change of abode, does not constitute a change of domicile.' *Eel River R. Co.* v. *State, ex rel.,* (1900) 155 Ind. 433, 447. To the same effect see *Penfield* v. *Chesapeake, etc. R. Co.,* (1890) 134 U.S. 358, 10 Sup. Ct. 566, 33 L. Ed. 940, and 24 Am. and Eng. Ency. Law (2d ed.), 697, and cases collated. An unsettled, indefinite or floating intention, as it is sometimes called, to establish a permanent home or residence in some undetermined locality does not affect the actual residence. So it may be here said that a journey into another state or territory for inspection, accompanied with an intent permanently to remove to such other state, if a satisfactory place is found, does not amount to a change of residence until an approved location has been not only discovered and chosen, but some affirmative step taken in the transfer of personal effects from the former to the latter place, as the only and *bona fide* home."

Moreover, a review of the above case law indicates a presumption which may be useful in determining one's residence. According to *Green, supra:*

"We may take into consideration, in this connection, the presumption that the residence of a person shown to have been in a particular place continues in that place until the contrary is shown." *See also, State ex rel. White* v. *Scott, supra; but see Vlandis* v. *Kline,* (1973) 412 U.S. 441, 93 S. Ct. 2230, 37 L. Ed. 2d 63.

The statutory guidelines are set forth in Ind. Code § 3-1-21-3, Burns § 29-4803 (Code Ed.), which provides:

*"Residence of voters—Rules for determining.*—In determining the residence of a voter the precinct election boards shall be governed by the following rules so far as they are applicable:

"(1) A person shall not be considered to have gained a residence in any county into which he has come for temporary employment, educational, or other purposes merely without the intention of making such county his permanent home;

"(2) If a person goes into another state or county within this state with the intention of making it his residence, he shall be considered to have lost his residence in this state, or the county from which he removed;

"(3)   If a person removes to another state with the intention of remaining there for an indefinite time as a place of residence, he shall be considered to have lost his residence in this state, notwithstanding he intends to return at some future time;

"(4)   The place where a man's immediate family resides shall be considered his residence, but if it be a temporary establishment for his immediate family, or for transient purposes it shall not be so considered;

"(5)   If a man has his immediate family living in one place and he does business in another, the former shall be considered his residence, but when a man has taken up his abode at any place with the intention of remaining there, and his family refuses to reside with him, then such place shall be considered his residence; a married woman not living in a household with her husband may establish a separate voting residence from that of her husband;

"(6)   Subject to the provisions of this article [3-1-1-1— 3-1-33-2], the residence of a single man shall be considered to be where he usually sleeps;

"(7)   No person employed temporarily in the construction or repair of any railroad, canal, municipal, or other work of public nature, or state or federal work project shall acquire a residence in any precinct into which he came for such purpose; but this provision shall not be held to extend to station agents or sectionmen who permanently reside in such precinct, and in determining the right of any person employed by a railroad company or upon any public work to register to vote, all the members of the precinct election board shall be satisfied that he is a bona-fide resident of the precinct and not there for temporary purposes merely, and his unsupported affidavit shall not be held conclusive as to any fact necessary to entitle him to vote;

"(8)   No soldier, seaman, or marine, in the army or navy of the United States or of their allies, shall be deemed to have acquired a residence in the state in consequence of having been stationed within the same; nor shall any such soldier, seaman or marine have the right to vote;

"(9)   Any permanent inmate of a soldier's home shall be considered a resident of the precinct in which the same is located;

"(10)   No person shall be deemed to have lost his residence in the state by reason of his absence either on business of this state or of the United States;

"(11)    If a person is adjudged insane or feeble minded and is committed to an institution for the insane or feeble minded, he shall not be considered to have gained a residence for voting purposes in the county, township, ward or precinct in which the institution to which he is committed is located.

The constitutional provisions are Art. 2, §§ 3 and 4. Those provisions correspond with Ind. Code § 3-1-21-3 (8) and (10), Burns § 29-4803 (8), (10), (Code Ed.), and so are not repeated here.

2.   *Statement on the Facts.*

The hearing officer found, and the record supports, such finding that:

"The Respondent was born April 24th, 1932, at Tell City, Indiana, and grew up in Tell City, living with his family at 914 Eleventh Street."

Thus, respondent's domicil of origin was Tell City.

The next significant finding is:

"In September of 1954, three months after his graduation from Purdue University, the Respondent was called to active duty in the United States Air Force.

"Respondent spent two years in the United States Air Force, and during his entire period of active duty, he was stationed in the Washington, D.C., metropolitan area."

Under that portion of Ind. Code § 3-1-21-3, Burns § 29-4803 (Code Ed.), *supra,* which provides, "No person shall be deemed to have lost his residence in the state by reason of his absence . . . on business . . . of the United States," respondent's domicil of origin was not lost while he was in the Air Force.

Section 15 of the RESTATEMENT OF CONFLICTS provides:

#### "DOMICIL OF CHOICE.

"(1)    A domicil of choice is a domicil acquired, through the exercise of his own will, by a person who is legally capable of changing his domicil.

"(2)    To acquire a domicil of choice, a person must establish a dwelling-place with the intention of making it his home.

"(3)   The fact of physical presence at a dwelling-place and the intention to make it a home must concur; if they do so, even for a moment, the change of domicil takes place.

"(4)   A person can acquire a domicil of choice only in one of three ways:

  (a)   having no home, he acquires a home in a place other than his former domicil;

  (b)   having a home in one place, he gives it up as such and acquires a new home in another place;

  (c)   having two homes, he comes to regard the one of them not previously his domicil as his principal home."

After respondent left the military service, the facts indicate that he gave up his domicil of origin (Tell City) and established a domicil of choice, perhaps several, in the metropolitan Washington, D.C. area. The following findings, supported by the record indicate such change.

"2.

\*   \*   \*

"Prior to his leaving active duty with the United States Air Force in September of 1956, the Respondent obatined employment with the United States Department of Commerce in Washington, D.C. Before beginning his job with the Department of Commerce, the Respondent took a one month vacation and spent the time with his family in Tell City, Indiana.

"While in the Air Force, the Respondent commenced Law School at Georgetown University in Washington, D.C., attending school at night.

"In July of 1959, the Respondent left his job with the Department of Commerce and went to work in the Department of Navy in Washington, D.C. He stayed with the Department of Navy until May of 1965, at which time he was employed by the United States Department of Justice as a Patent Attorney in Washington, D.C.

"Respondent's employment with the Department of Justice continued until early April of 1970, at which time he resigned because he was a Candidate for the Office of Judge of the Perry Circuit Court in Perry County, Indiana.

\*   \*   \*"

"6.

"At the thirty-second page of David Evrard's government personnel record there appears a document filled out by David E. Evrard, and signed by David E. Evrard, in which a space for 'Legal Residence' was filled out as 3700 King Street, Alexandria, Virginia."

"7.

"On September 30, 1968, David E. Evrard registered to vote in Arlington County, Virginia, by personally filling out and signing a voters registration form in which he listed his address as 4262 SO. 35th St., Arlington, Virginia, 22206, and his previous address as 3700 King Street, Alexandria, Virginia. The said voter's registration form contained the following registration oath:

" 'REGISTRATION OATH

" 'I hereby make application for registration as a qualified voter of Arlington, Virginia. I, David E. Evrard, do solemnly swear (or affirm) that I am entitled to register under the Constitution and laws of this State, and that I am not disqualified from exercising the right of sufferage by the Constitution of Virginia.

" 's/ DAVID E. EVRARD
Signature of Voter' "

"8.

"On November 28, 1969, in making application for a marriage license in Harrison County, Indiana, David E. Evrard stated under oath in writing that his place of residence on that date was 3224 Graham Road, Falls Church, Fairfax County, Virginia."

"9.

"Ten days later, on December 8, 1969, David E. Evrard personally enrolled Jacqueline Buckler in Walnut Hill Elementary School under the name of Jacqueline Evrard, and, on the enrollment form which he filled out, David E. Evrard's name appears on the line for the 'Father' as 'step father' and the words 'Margaret Anne', with no last name shown, appear in the space provided for the Mother's name. In this same document, Respondent set out the 'Family Address' as 3224 Graham Road, Falls Church, Virginia."

"19.

"On March 4, 1970, David E. Evrard registered two automobiles with the motor vehicle licensing bureau of the

State of Virginia, giving his address as 3224 Graham Road, Falls Church, Virginia."

Additionally, the record indicates that respondent purchased and refurbished real estate for resale, and maintained rental property in the D.C. area.

While respondent remained at all times in the employment of the U.S. government after his severance from the service, I believe the foregoing evidence clearly shows that respondent established a domicil of choice in the D.C. area, and finally at Falls Church, Virginia. I reach this conclusion notwithstanding the provisions of Ind. Code § 3-1-21-3 (10) upon which respondent relied and the majority apparently ("From 1954, when he graduated from Purdue through July, 1970, at which time he completed his move to Perry County, respondent was absent from the State of Indiana by reason of his military service and his employment with the U.S. Government,") finds applicable.

The declaration of candidacy statute, *supra,* indicates that the proper place for filing a declaration of candidacy for the office of circuit court is with the secretary of state, not the county clerk. The critical point for determining whether respondent had established a new domicil of choice in Indiana is not March 7, 1970, the date when respondent filed his declaration in Perry County, but rather, March 11, 1970, when respondent swore to the truth of his declaration of candidacy and March 16, 1970, when it was filed with the secretary of state.

Respondent alternatively maintained, and the majority opinion implicitly holds, that respondent acquired a new domicil of choice in Indiana, *prior* to March 16, 1970. This finding is based upon:

(1) Respondent's Thanksgiving and Christmas visits to Tell City in 1969;

(2) Political visits, including caucuses with party leaders and public announcement of candidacy, during the months of January, February, and March, 1970;

(3)   Respondent's testimony that he made up his mind to run for the office in early January, 1970;

(4)   Respondent's testimony and that of his friend who was a realtor, that respondent consulted him about finding the respondent a home in Tell City, sometime in early January, 1970.

The majority apparently finds these actions sufficient to show that respondent's intent to remove was unequivocally formed, and a fixed settlement at Tell City was resolved upon with no present intention of returning to Falls Church, Virginia. *See State ex rel. White* v. *Scott, supra.* The majority finds that the above evidence is sufficient to rebut the presumption that respondent's residence in Falls Church, Virginia continued as of March 16, 1970. *See Green, supra.* The record does not sustain this conclusion.

Before setting out that portion of the record which demonstrates that respondent's plans to return to Tell City had not yet become unequivocal, the following sections, comments and illustrations of the RESTATEMENT OF CONFLICTS should be considered:

"§ 19.   NATURE OF INTENTION REQUIRED.
"The intention required for the acquisition of a domicil of choice is an intention to make a home in fact, and not an intention to acquire a domicil.

"*Comment:*
"*a.   Intention to make home and desire to acquire domicil.* A person sometimes desires to have his domicil in a certain place, in order to get the benefit of one or more of the legal consequences of having a domicil there, but does not wish to change his home to that place; this desire to have a domicil in a certain place has no effect in fixing his domicil there.

\*    \*    \*

"*Illustrations:*
"1.   A, domiciled in State X, desires to vote in state Y; he goes there on the registration day, intending to claim a domicil there, but not intending to make a home there,

and has his name put on the voting list as domiciled there. He is not domiciled in Y."

## "§ 20.  PRESENT INTENTION.

"For the acquisition of a domicil of choice the intention to make a home must be an intention to make a home at the moment, not to make a home in the future.

*"Comment:*

"*a.* In order to possess the requisite intention, one must be able to say not, this is to be my home, but, this is now my home."

See also, Ind. Code § 3-1-21-3(3), (4), Burns § 29-4803(3), (4), (Code Ed.), *supra.*

The record shows that the declaration of candidacy filed with the secretary of state on March 16, 1970, was completed and sworn to before a notary in Washington, D.C. on March 11, 1970. On those dates, respondent, his wife and family lived at 3224 Graham Road, Falls Church, Virginia, and respondent's stepchild attended school in Falls Church. On March 4, 1970, respondent procured new Virginia vehicle registration.

Most of the overt steps which respondent took in demonstrating his intention to move to Tell City did not transpire until after his declaration of candidacy had been filed. The first of these steps occurred in mid-April when respondent submitted his resignation to the Justice Department, thereby severing his financial lifeline. The testimony regarding his registration should be carefully scrutinized, for it shows that respondent had not yet—the middle of April, 1970—irrevocably committed himself to Indiana; he had to discuss the matter with his wife to decide whether to resign and run, or to withdraw from the race and continue his employment with the Justice Department.

With respect to his resignation, respondent testified at the hearing before Judge Rabb as follows:

DIRECT EXAMINATION OF DAVID E. EVRARD BY
JOHN G. BUNNER, COUNSEL FOR THE RESPONDENT

Q. "All right. When did your regular employment with the Department of Justice cease?"

A. "In April of 1970. That was when the regular employment under the former way I was employed as a civil servant ceased."

Q. "Will you tell us how that came about?"

A. "William Ruckelshaus called me at my office and asked me to come over to his office. He was head of the civil division of the Department of Justice at that time. When I got there, as I recall, both he and Mr. Baize, his assistant, were present and, I'm almost sure that's right, I know Mr. Baize was present and I'm almost sure Bill was. They informed me that they had been informed that I had filed candidacy for a public office and that they wanted to know whether I intended to stay with the Department or run for office."

Q. "Was it more or less an either or —"

A. "It was definitely an either or."

Q. "So, uh, did you inform them at that time of your intentions?"

A. "As I recall, I didn't inform them at that very moment. I think I called my wife and told her what had happened. We had already made up our mind and the only thing that this could have changed was the fact that we would be even longer without employment and which meant we had to try to live on our savings and I felt that I should ask her before I went ahead and told him."

Q. "And this was in what part of April, do you know?"

A. "Mid April, I don't recall exactly when it was."

[R.p. 116-117.]

In his deposition, on February 5, 1975, respondent testified as follows:

QUESTIONS BY DAVID V. MILLER, SPECIAL
PROSECUTOR

Q84 "Had you intended to resign in April?"

A. "I intended to resign in early Spring; I didn't have a particular date picked out because I didn't know, No. 1, exactly when it would be necessary for me to actually be physically present in Perry County because

of election purposes; I discussed that with the County Chairman."

Q85 "Did someone have a conversation with you in the Justice Department indicating to you that it would be necessary for you to resign because of your candidacy?"

A. "Both William Ruckleshaus (spell), who was then head of the civil division of the Department of Justice, and his assistant, Gary Bayes (spell) ; I talked to both of them."

Q86 "Were both of them of the opinion that your employment with the Department of Justice and your candidacy for a political office were violations of the Hatch Act?"

A. "That's what they said."

Q87 "Did those conversations occur in April?"

A. "Yes."

Q88 "That was the reason for your resignation?"

A. "Yes."

\* \* \*

Q92 "Before telling them that you would resign did you discuss the matter with anyone—not the matter of being rehired—but did you confer with anyone about whether or not you should resign?"

A. "I can't recall having done so; I'm sure I called my wife."

And finally, Gary H. Baise, who at the time of respondent's resignation was serving as special assistant to the Assistant Attorney General of the United States, testified in his deposition, filed of record in this matter, as follows:

QUESTIONS BY J. HOWE BROWN, COUNSEL
FOR PETITIONER

Q. "Did you have any connection with Mr. Evrard in terms of his work or his employment?"

A. "No, not really, no. Not on a day-to-day basis."

Q. "What were the occasions that caused you to become acquainted with him?"

A. "I met Mr. Evrard first when Mr. Ruckelhouse (phonetic) and I joined the department, because it was a practice of ours to go around to see every attorney and every individual who worked in the department at that time. That would have been approximately March or April of 1969.

"The only other occasion I had to meet Mr. Evrard was in approximately March of 1970."

Q. "What was that occasion?"

A. "It had been brought to my attention that he was running for an office in the State of Indiana."

Q. "And did you do anything or have any conversation with Mr. Evrard with regard to that information?"

A. "Yes, I did."

Q. "What was the substance of that conversation?"

A. "I called Mr. Evrard in for an appointment and I asked him if he was running for a public office in the State of Indiana."

Q. "What response did Mr. Evrard give?"

A. "He replied that he was."

Q. "What further conversation took place?"

A. "At that time, I advised him that I would give him really two choices. One, he could withdraw from that office and remain in the Department of Justice and that I would enter nothing in his file regarding the Hatch Act, which he was—or at least I was advised that he was violating at that time; or he would have to leave the employment of the Department of Justice obviously, because he was in violation of the Hatch Act."

Q. "You say you advised him of this?"

A. (Nods affirmative)

Q. "What response did he make?"

A. "As I recall, he said he wanted to call his wife and talk with her about the situation."

Q. "What conversation took place?"

A. "Again, as I recall, he left my office that afternoon, and I heard from him the following day. He told me that he had discussed this matter with his wife, and he thought that he would resign his position and return to the State of Indiana."

Q. "Did he in fact resign his position?"

A. "Yes, he did."

The next significant overt act was respondent's purchase of a home in Tell City, on May 8, 1970, following the primary of May 5. Finally, respondent moved his family to Tell City in mid-summer.

It is fitting and proper to consider the acts of respondent prior to March 16, 1970, in determining his intent on that

date. It is a bootstrap approach, however, to consider the events which occurred after that date, as the majority opinion does, as establishing respondent's intent on March 16, 1970. From the record, respondent's acts prior to March 16, 1970, do not demonstrate, to paraphrase the language of § 19 of the RESTATEMENT OF CONFLICTS, *supra,* an intention to make Tell City a *home in fact,* but demonstrate only a desire to acquire a domicil.

The writer is of the opinion that respondent was not a qualified voter as required by the declaration of candidacy statute and is, therefore, guilty of the offense charged.

## II.

Respondent was also charged with aiding and abetting his wife in her violation of the election laws of this state which prohibit nonresidents from voting. These laws are set out in the majority opinion. In a very cursory treatment of this charge, the majority states:

". . . we find that the same legal test of residence should be applied to determining whether or not respondent's wife established a voting residence at the home of her husband's parents. It would appear to us that Margaret Evrard had the right to choose to adopt the voting residence of her husband. By reason of this voluntary choice and her marriage to respondent, she is entitled to claim the benefit of his connections with his parents' home. We therefore find that the evidence is insufficient to support any conclusion that respondent aided and abetted his wife in unlawfully violating the election law, or conspired with his father to so violate the law."

Ordinarily, the domicil of the husband is the domicil of the wife. *Jenness* v. *Jenness,* (1865) 24 Ind. 355; Ind. Code § 3-1-21-3, Burns § 29-4803 (Code Ed.). Where no separation is shown to have occurred, the finding that respondent's domicil was Virginia dictates, as a matter of law, that respondent's wife was also a Virginia domiciliary. Such conclusion, however, does not rest solely upon the principle of law announced. With regard to the residence and voting of

respondent's wife, the hearing officer made the following findings:

### "12.

"On May 3, 1970, David E. Evrard traveled from the State of Virginia to Tell City, Indiana, for the purpose of being present to cast his vote in the Indiana Primary Election on May 5, 1970. David E. Evrard was accompanied on his trip by Margaret Ann Buckler Evrard, who, with Respondent's knowledge, also voted in the said Indiana Primary Election of May 5, 1970."

### "20.

"Margaret Ann Yowaiski Buckler Evrard was born in Maryland and lived only in Maryland and in the Washington, D.C. area until moving to Indiana in July of 1970. In registering to vote in Perry County, Indiana on March 7, 1970, Margaret Ann gave her address as 914 11th St., Tell City, Indiana. There is insufficient evidence that Margaret Ann had her residence at that address."

### "21.

"On May 5, 1970, Margaret Ann Yowaiski Buckler Evrard voted in the Indiana Primary Election, in Perry County, Indiana. In order to cast such vote, Margaret Ann traveled to Indiana from Virginia on May 3, 1970 in a private aircraft flown and owned by David E. Evrard. All of these actions by Margaret Ann Yowaiski Buckler Evrard, were done with the full knowledge of David E. Evrard."

In addition, in the parties' stipulation of facts, we find:

"19. Margaret Anne Buckler (Evrard) was divorced from Lawrence Raley Buckler on April 2, 1970 by DECREE OF DIVORCE A VINCULO MATRIMONII of the Circuit Court of Arlington County, Virginia upon the basis of depositions taken 2-3-70. On 2-3-70 Margaret Anne was living with David E. Evrard at 3224 Graham Road, Falls Church, Virginia and in the course of said deposition she stated that she considered herself to be a domiciliary of Virginia and intended to remain there, and that her name was Margaret Anne Buckler. (Contents of Deposition have been stipulated)"

"21. Margaret Ann Evrard was first issued an Indiana Driver's License in January, 1972. Prior to that time, she was licensed to drive under the name of Margaret Anne Yowaiski by the State of Maryland."

The whole record clearly shows that Margaret Anne Evrard was not a resident of this state when she voted in the primary election of 1970. The record also shows that respondent flew her to this state for the purpose of voting in said election. This charge is supported by sufficient evidence. The majority's failure to address the hearing officer's finding that there was insufficient evidence of Mrs. Evrard's residence is inexcusable. At the same time, a review of the record indicates that there was insufficient evidence presented of any conspiracy to violate the above laws involving respondent and his father. I, therefore, concur with such finding of the majority.

## III.

The final charge against respondent is that he aided and abetted his wife in the commission of the felony of bigamy. While the majority finds that respondent had no knowledge that Mrs. Evrard's husband was still alive, a review of the entire record does not lead to that conclusion.

The parties stipulated to the authenticity of the following facts:

"12. On January 12, 1964, Lawrence Raley Buckler and Margaret Anne Yowaiski (now known as Margaret Anne Evrard) were married in Washington, D.C. Two children were born of this marriage: Jacqueline Denise Buckler on 5/27/64 and Joseph Michael Buckler on 5/16/66. In 1967 Mr. and Mrs. Buckler separated. To the best of David Evrard's knowledge, Lawrence Buckler last saw said children in the Spring or Summer of 1968."

"13. Lawrence Raley Buckler was inducted into the United States Army on November 12, 1968, a draftee; he served in Vietnam in 1969 and 1970 and was discharged in 1970. (Army Record of Lawrence Raley Buckler stipulated to be genuine)"

"14. Neither David Evrard or Margaret Anne Buckler Evrard ever received any official report from any member of the United States Army or any other official source that Lawrence Raley Buckler was killed in action or missing in action or captured or otherwise dead at any time during his service with the United States Army."

"15. The marriage of Margaret Anne Yowaiski Buckler and Lawrence Raley Buckler was not terminated by death."

"16. In August, 1969, David Evrard contacted Everett Germain, an Attorney licensed to practice in the State of Virginia regarding the filing of a divorce action on behalf of Margaret Anne Buckler against Lawrence Raley Buckler. Mr. Germain accepted employment for said purpose and the said divorce action was filed on September 17, 1969, in the Arlington County Circuit Court, being docketed as Chancery Cause #19755."

"17. On December 29, 1969 David E. Evrard married Margaret Anne Yowaiski Buckler at Frenchtown, Harrison County, Indiana pursuant to a marriage license issued by the Clerk of said County, based upon an Application for Marriage License signed under oath by David E. Evrard and Margaret Ann Yowaiski Buckler. (The contents of said Application have been stipulated)."

"18. On the date when said application was made and signed David E. Evrard knew that the last name of his prospective bride was Buckler rather than Yowaiski and that there was, at that time, pending in the Circuit Court of Arlington County, Virginia, a proceeding for divorce filed on behalf of Margaret Anne Buckler being Chancery Cause No. 19755 naming Lawrence Raley Buckler as defendant. On 11-28-69 and 12-29-69 said proceeding for divorce had not been dismissed nor was David E. Evrard aware of any contact having been made with Everett Germaine regarding dismissal thereof."

The full findings of the hearing officer on the issue are as follows:

"4.

"The Respondent became friends with Margaret Ann Yowaiski and with her family. He frequently visited her family near Maddox, Maryland. In 1964, Margaret Ann Yowaiski married Lawrence Buckler and two children were born of that marriage.

"On November 4, 1967, Margaret and Lawrence Buckler separated. After the separation, there was very little contact between Margaret Buckler and her husband.

"In November of 1968, Buckler was drafted into the Army. His wife and children were not listed as next-of-kin, but rather he listed his mother. No allotment was taken out

of Buckler's Army pay for his children and his insurance policy was made payable to his mother.

"In the summer of 1969, David Evrard and Margaret Buckler discussed marriage and in September of that year she filed suit for divorce against Lawrence Buckler. He was served while in Vietnam with the documents relating to the proceeding and pursuant to Virginia Law, was represented at the subsequent hearing in April of 1970, by court appointed attorney.

"Later in the Fall of 1969, Margaret Buckler was told that Lawrence Buckler had either been killed or had died in Vietnam. Her informant's name and address was unknown to Margaret Buckler as hereinafter set out in these findings.

"She immediately informed the Respondent of this conversation and over the Thanksgiving vacation of that year, they obtained a marriage license in Harrison County, Indiana.

"On December 29, 1969, David Evrard and Margaret Buckler were married in Harrison County, Indiana, by the Respondent's Brother who is, and was at that time, a Roman Catholic Priest.

"The Respondent had never been married prior to his marriage of December 29th, 1969.

"From a period of time prior to his making application for a marriage license in Harrison County, Indiana, in November of 1969, and until a time subsequent to his marriage on December 29, 1969, the Respondent believed that Lawrence Raley Buckler was, in fact, dead, even though he did nothing to verify the information he received from Margaret Ann.

"Subsequent to the marriage, Margaret Evrard received information that caused her to believe that there was the possibility that Lawrence Buckler was alive, and conveyed such information to Respondent.

"The Respondent made inquiries of the Department of Defense and some time later learned that Buckler was in fact alive.

"Margaret then proceeded with the divorce proceeding that had been filed in September of 1969, and she was granted a divorce from Lawrence Buckler in early April of 1970.

"After her divorce was granted and prior to May 5, 1970, David Evrard and Margaret Evrard were remarried in Tijuana, Mexico."

"13.

"Margaret Ann Evrard heard of the supposed 'death' of her first husband, Lawrence Raley Buckler, from a person whose name she cannot remember and whose relationship to Mr. Buckler she cannot explain. She gave this information to Respondent. Margaret Ann Buckler and the Respondent did nothing and made no effort to verify the account of the 'death' of Lawrence Raley Buckler. Neither Respondent or Margaret Ann Buckler informed attorney Everett Germaine, who was Margaret Ann Buckler's attorney in her divorce action, concerning the 'death' of Mr. Buckler."

"14.

"That less than one month after her marriage to David Evrard, Margaret Ann Buckler Evrard conversed with a person at her prior place of employment, and heard that Lawrence Raley Buckler was alive. Respondent's wife does not remember the exact time of the occurrence or the identity of the person conveying such information."

"15.

"The Court finds that on December 29, 1969, the date of this marriage, that Lawrence Raley Buckler was alive."

"16.

"After the Decree of Divorce rendered in April of 1970, terminating the marriage of Margaret Ann Buckler and Lawrence Raley Buckler, David E. Evrard and Margaret Ann Buckler went to Tijuana, Mexico and were married again on April 18, 1970."

In addition to these stipulations of fact and the hearing officer's findings, the record as a whole, particularly the testimony of Mrs. Evrard, deserves closer scrutiny than that which the majority opinion gives it. It is incredulous, to say the least, that a mother of two children would not make further inquiry upon being advised by a stranger that her husband and father of her children had been killed in the war. It is only common knowledge that advice of death in such cases travels by official messenger. Mrs. Evrard had a high school education and attended a junior college for one year. She testified that on learning of her husband's purported death:

". . . the biggest thing on my mind at that time was that I had a man that I respected, that truly wanted to marry me and take care of my children. I was going to be guaranteed food and clothes and not have my electricity turned off and all of the things. That was the most important thing to me at that time."

Although apparently concerned about her financial condition, Mrs. Evrard made no effort whatsoever to procure any death benefits to which she or her family might have been entitled. When Mrs. Evrard told respondent of her husband's death, he failed to verify the death with the Department of Defense, although the record shows he was familiar with the military locator service and was himself a former member of the armed forces. Nor did respondent or Mrs. Evrard notify the attorney, whom the respondent knew and selected for Mrs. Evrard, to terminate his efforts in procuring her a divorce from Lawrence Buckler. In short, the evidence and the reasonable inferences therefrom lead inescapably to the conclusion that respondent knew when he married Mrs. Evrard that her former marriage had not been terminated by the death of her husband or by a decree of divorce.

## IV.

The actions for which respondent was charged transpired prior to his election. Since his election, respondent has served responsibly in his position as judge of the Perry Circuit Court. Based on evidence introduced by the respondent, the hearing officer found that:

"Respondent has a good to excellent reputation as a Judge and is held in high regard as such by Judges and Attorneys of Southern Indiana."

It is commendable that respondent has conducted the Perry Circuit Court in accordance with the Code of Judicial Ethics. It is unfortunate that respondent did not adhere to the same high standards when he was a candidate.

Impressed by respondent's service upon the Perry Circuit bench, the majority opinion has chosen to ignore or disregard

facts in the record which demonstrate respondent's guilt as charged.

Respondent's post-election conduct might be considered in mitigation of punishment upon finding of guilt, but it should not be considered in deciding guilt or innocence of the acts charged.

It is my belief the record as a whole sustains three of the charges against respondent. These transgressions are of such serious nature that this Court should not in good conscience ignore them. At a very minimum, this Court should issue a public reprimand to respondent and should consider a definite period of suspension. Only then would we announce with judicial vehemence that the office of circuit judge is not yet a prize in a race where no holds are barred.

NOTE.—Reported at 333 N.E.2d 765.