[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant proceeding was generated by the removal of the plaintiff's (hereafter "Fand") name from the enrollment list of the Republican Party by the defendant (hereafter "Legnard"), the Republican Registrar of Voters of the Town of Bethel. He asserts that he was notified by letter that his name was removed from the Republican Party rolls for a two year period effective November 3, 1993, in accordance with Sec. 9-61 of the General Statutes. That deletion arose out of his candidacy for election on November 2, 1993, under a party designation other than the Republican Party.
He has challenged Sec. 9-61 as violative of both federal and state constitutions, and claims a declaratory judgment and the restoration of his name to the list. His immediate avenue of relief was this application for a preliminary injunction blocking the erasure of his name from the list, as well as a court order restoring his name to that list until the constitutionality of said statute has been resolved by the court. The court will address the facial validity of the challenged statute and the question of a temporary injunction in this memorandum.
Section 9-61 provides, inter alia, that:
 If the name of any elector appears on the ballot label at an election only under a party designation other than that of the party with which he is enrolled, whether such elector was nominated by a major or minor party or by nominating CT Page 11047 petition, such name shall be removed from the enrolment list for a period of two years from the date of such election after which time he may apply for enrolment in said party.
Fand postulates that Sec. 9-61 is facially unconstitutional as it limits his right to vote, his right to associate with others for the common advancement of political beliefs and ideas, and his right to seek office. His argument specifically draws upon his fourteenth amendment rights to procedural due process and equal protection. His due process argument focuses on the denial of the opportunity to establish his party loyalty at a hearing, and establishes a conclusive presumption of disloyalty. The equal protection violation claimed arises out of treating party members who have sought office solely under the label of another party differently from those who have not.[1]
Legnard has responded that states have an interest in the integrity of the election process, and that Sec. 9-61 seeks to discourage members of one party from running on the ballot of another party in direct opposition to the first party's candidate. She maintains that the statute prevents the loser for a municipal office at a party primary or caucus from running for the same office for another party and acting as a "spoiler" against the candidate of his own party. She offers a rational conclusion that Fand has run for public office on the ballot of another party, in opposition to the party's nominee, and that the very nature of the action, which must necessarily siphon off votes from the party's candidate, is fundamentally destructive of the interests of the party.
DUE PROCESS
Courts, and to some extent, academicians, enjoy a penchant for piously declaring that due process, as we know it, is appropriately determined to be a substantive and/or a procedural right. We then proceed to blissfully interchange the concepts and continue the confusion over the recognition and application of those concepts. It is conceded that they may indeed coexist at times in any given litigation. In this instance, it cannot be seriously much less honestly argued that the right to vote is a fundamental (substantive) right. The manner of intrusion upon that right, however, is generally a procedural manner.
Procedural due process ordinarily demands no less than notice of the alleged sanctionable conduct and the opportunity for a CT Page 11048 meaningful hearing at an appropriate time. The due process challenge to Sec. 9-61 will be determined as a question of repugnance to procedural due process.
States retain the power to regulate their own elections. As a practical matter, there must be a substantial regulation thereof if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.Burdick v. Takushi, ___ U.S. ___, 112 S.Ct. 2059, 2063,119 L.Ed.2d 245 (1992). Are those means adopted by the state to preserve its regulatory interest, i.e., mandatory erasure without a hearing, violative of Fand's procedural due process rights?
Other provisions contained in Sec. 9-61, and provisions contained in the preceding section, 9-60 DO authorize hearings for persons who engage in certain acts connoting party disloyalty. Section 9-60, for example, authorizes the discretionary erasure or exclusion of a person from a party's enrollment list for lack of good faith party affiliation. If it appears that a person is not affiliated with, or in good faith a member of, that political party and does not intend to support its principles or candidates, such person is cited to appear before the party to show cause why his name should not be erased or excluded from such enrollment list. At the hearing, if it appears that it is not the bona fide intention of such person to affiliate with, or that such person is not affiliating with, such political party and does not intend to support the principles or candidates of such party, his name may thereupon be erased or excluded from the enrollment list of such party. A person who appears on a ballot label solely under a party designation other than that of the party in which he is enrolled, however, is excepted from the hearing provision of this statute.
The notice and hearing provisions of Sec. 9-61 in certain circumstances are spelled out in relevant part:
 Enrolment in any other political party or organization, active affiliation with any other political party or organization, knowingly being a candidate at any primary or caucus of any other party or political organization, or being a candidate for office under the designation of another party or organization, within a period of two years prior to the date of the notice as provided in section 9-60 shall be prima facie evidence that any elector committing any such act is not affiliated with, or in good CT Page 11049 faith a member of, and does not intend to support the principles or candidates of the party upon the enrolment list of which his name appears. . . .
Upon reasonable proof of any such acts, the names of such persons may be stricken from the enrollment list. With respect to these individuals, the statute further provides that the same procedure as to notice to appear thereon, return and hearing is to be followed as provided in Sec. 9-60. The statute, however, as previously noted, excepts individuals who appear on the ballot label at an election only under a party designation other than that of the party with which he is enrolled from such notice and hearing procedures. One may only conclude, therefore, that this statute creates an irrebuttable presumption of party disloyalty on the part of such individuals. "Statutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments."Vlandis v. Kline, 412 U.S. 441, 446, 93 S.Ct. 2230,37 L.Ed.2d 63 (1972). See also Stanley v. Illinois, 405 U.S. 645,92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (irrebuttable statutory presumption that unmarried fathers are unfit to raise their children violates the constitution); Carrington v. Rash, 380 U.S. 89,85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (permanent incontrovertible presumption that soldiers are nonresidents for purposes of voting is unconstitutional).
In Vlandis v. Kline, the issue framed may be expressed as whether a statutorily created permanent irrebuttable presumption of nonresidence was unconstitutional. In Connecticut, nonresidents enrolled in the state university system were required to pay higher tuition than state residents, and a statute provided that unmarried students were classified as nonresidents if they had a legal address outside Connecticut for any part of the one year period prior to applying for admission. Married students living with their spouses, however, were classified as nonresidents if their legal address at the time they applied for admission was outside of Connecticut. Residency classifications were permanent and irrebuttable while a student remained at the university, and the court reviewed the constitutional validity of this conclusive and unchangeable presumption of nonresident status.
The court observed that both appellees possessed many of the indicia of Connecticut residency, but that under Connecticut's statutory scheme, neither was permitted any opportunity to CT Page 11050 demonstrate the bona fides of Connecticut residence for tuition purposes, and neither could ever have such an opportunity in the future so long as that person remained a student. The state offered several reasons to justify this permanent irrebuttable presumption. It argued that it had a valid interest in equalizing education costs between residents and nonresidents, and that it could reasonably decide to favor established residents, whose past tax contributions would have been higher with lower rates. It concluded by asserting that the statute provided a degree of administrative certainty.
The court recognized that the state's conclusive presumption of nonresidence, rather than ensuring that only bona fide residents received their full subsidy, actually ensured that certain bona fide residents, such as the appellees therein, would never receive their full subsidy. It reasoned that in terms of the state's own asserted interest in favoring established residents over new residents, the provisions of the statute were so arbitrary as to constitute a denial of due process of law. In addressing the assertion of administrative certainty, it emphasized that reasonable alternative means for determining bona fide residence were available.
The court determined that since Connecticut purported to be concerned with residency in allocating the rates for tuition and fees in its university system, the due process clauses prohibited the denial of resident rates on the basis of a permanent and irrebuttable presumption of nonresidence, when that presumption is not necessarily or universally true in fact, and when the state has reasonable alternative means of making the crucial determination. It is emphasized that due process standards required the state to allow such individuals the opportunity to present evidence to show that they were bona fide residents entitled to resident rates.
The court clearly recognized a state's legitimate interest in protecting and preserving the quality of its universities and the right of bona fide state residents to attend such institutions on a preferential tuition basis. It concluded, however, that a permanent irrebuttable presumption of nonresidence — the means adopted by Connecticut to preserve that legitimate interest — was violative of the Due process clause, because it provided no opportunity for students who applied from out-of-state to demonstrate that they had become bona fide Connecticut residents.Vlandis v. Kline, supra, 441-453. CT Page 11051
Legnard argues that states have an interest in the integrity of the election process. A statute that seeks to ensure that members are loyal to their political parties may well be a legitimate device for achieving this objective. However, it is hardly clear just how the creation of an irrebuttable presumption
of party disloyalty, solely for the particular act engaged in by Fand, will necessarily preserve the state's interest.
There can be no doubt that the totality as it were of our statutory scheme provides for notice and a hearing for persons who engage in certain acts that connote party disloyalty. Section9-61. By denying Fand an opportunity for a hearing, the statute establishes a conclusive irrebuttable presumption of disloyalty when such disloyalty may not in fact be necessarily or universally true. By authorizing hearings for individuals who engage in other acts connoting party disloyalty, the statutory scheme demonstrates that a reasonable alternative means of making this crucial determination exists.
This court could well find that the irrebuttable presumption created by Sec. 9-61 is so arbitrary as to constitute a denial of due process of law. Its probable invalidity is drawn into a sharper focus because there are other reasonable and practicable means of establishing the facts upon which the interest asserted by the defendant is premised. See Vlandis v. Kline, supra. Fand has perhaps inadvertently exposed an alternative which is worthy of comment. That alternative is the probable acceptability of a shorter period of disenfranchisement. If the registrar's application of the statutory sanction is violative of procedural due process, the alternative would also fall before this challenge.
While the foregoing determination is dispositive of this matter at this state of the process, Fand has raised additional arguments which this court believes should be addressed.
FREEDOM OF ASSOCIATION
The freedom to associate with others for the common advancement of political beliefs and ideas is a form of "orderly group activity" protected by the first and fourteenth amendments.[2] An individual's right to associate with the political party of one's choice is an integral part of this basic constitutional freedom. The constitution entrusts the CT Page 11052 administration of the electoral process to the states; however, in exercising their powers of supervision over elections and in setting qualifications for voters, the states may not infringe upon basic constitutional protections. Kusper v. Pontikes,414 U.S. 51, 56-57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973).
To reiterate, states have the power to regulate their own elections. The court in Burdick v. Takushi, supra, discussed the necessary balancing process applicable to this asserted repugnance to the constitutions. Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.
Election laws will invariably impose some burden upon individual voters. Each provision of a code, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends.
Laws that burden the right to vote are not always subject to strict scrutiny. When considering a challenge to a state election law, a court must weigh the character and magnitude of the asserted injury to the rights protected by the first and fourteenth amendments that a plaintiff seeks to vindicate against the precise interests put forward by the state as justifications for the burden imposed by its rule, taking into the consideration the extent to which those interests make it necessary to burden a plaintiff's rights. In accordance with this standard, the rigors of the inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens first and fourteenth amendment rights. The regulation must be narrowly drawn to advance a state interest of compelling importance when those rights are subjected to severe restrictions. When a state election law only imposes reasonable, nondiscriminatory restrictions upon a voter's rights, however, a state's important regulatory interests are generally sufficient to justify the restrictions.
The issue in Burdick was whether or not Hawaii's ban on write-in voting unreasonably infringed upon its citizens rights CT Page 11053 under the first and fourteenth amendments. The court determined that because Hawaii's election code provided adequate ballot access through several alternative mechanisms, the state's ban on write-in voting only imposed a limited burden on voters' rights to make free choices and to associate politically through the vote. It then examined the state's interests in avoiding the possibility of unrestrained factionalism at general elections, and in guarding against "party raiding." It concluded that the state had asserted legitimate interests that were sufficient to outweigh the limited burden that the write-in voting ban imposes upon Hawaii's voters. Burdick v. Takushi, supra, 2063-2067.
It seems evident that Connecticut does have an interest with respect to protecting political parties against intrusion by individuals with interests adverse to those of the party.Marchitto v. Knapp, 807 F. Sup. 916, 918 (D. Conn. 1993). However, unduly restrictive state election laws may so impinge upon freedom of association as to run afoul of the first and fourteenth amendments. Kusper v. Pontikes, supra, 57. This result was demonstrated in Mandanici v. Fischer, 10 Conn. Law Trib., No. 27, p. 16 (Super Ct., February 22, 1984, Berdon, J.), where the court held that Sec. 9-61 represents an unconstitutional infringement upon a person's freedom of political association.[3]
In Mandanici, the plaintiff's name had been erased from the enrollment list of the Democratic Party, pursuant to Sec. 9-61, because his name had appeared on the ballot as a mayoral candidate under the designation of another party. The court emphasized that before the state could significantly interfere with a person's associational freedom, a showing must be made that the government's interest was a compelling interest, and that the government's interest could not be achieved by lessrestrictive means. The defendant had argued that the state's compelling interest in erasing the plaintiff's name was to provide political stability and to prevent voter raiding. The court conceded that the state had an interest in maintaining political stability and the integrity of the various routes to the ballot, but it maintained that the statute did not accomplish either of these goals. Citing to the legislative history of the statute, it emphasized that the only conceivable purpose of the statute was to punish the disloyal party member who runs for office under a different party label and that punishment is not a legitimate state purpose for substantially infringing upon the plaintiff's associational rights. The court concluded that the CT Page 11054 defendants had failed to establish that Sec. 9-61 served a compelling state interest. The court continued and recited that, even assuming that there is a compelling state purpose for the mandatory disaffiliation act, it nevertheless cannot pass constitutional muster because any such purpose could be achieved by less restrictive means. In citing Kusper v. Pontikes, supra, Berdon, J. stated that the length of time, even when very legitimate compelling state interests are at stake, could never be justified, and it emphasized that the statute completely disaffiliates individuals from their party for a two year period. The act not only prevents the person from voting in the primaries for local, state and federal office for the two year period, but it also prevents the person from serving as an officer of such party and even voting for party officers and in party caucuses. It completely severs the person's right to associate with the political party. That rationale can be accepted under the association argument but not, as recited, overcome the repugnance to due process.
The court concluded its reasoning by noting that the unconstitutionality of the statute was further underscored because the rules of the political party did not provide for such disaffiliation, and that an attempt to interfere with a party's ability so to maintain itself is simultaneously an interference with the associational rights of its members. It cited to Naderv. Shaffer, 417 F. Sup. 837, 845 (D. Conn. 1976), aff'd. 429 U.S. 989,97 S.Ct. 516, 50 L.Ed.2d 602 (1976) in support of that conclusion.
Kusper v. Pontikes, supra, cited by the court in Mandanici,
spoke to the constitutionality of an Illinois statute which prohibited individuals from voting in the primary election of a party if they had voted in the primary of any other party within the preceding 23 months. The United States Supreme Court concluded that the statute unconstitutionally infringed upon the right of free political association protected by the first and fourteenth amendments. It emphasized the substantial restriction of a voter's freedom to change his political party affiliation, and the effective locking of a voter into his pre-existing party affiliation for a substantial period of time following participation in any primary election, and each succeeding primary vote extended that period of confinement. The appellants had argued that the statute prevented "raiding," the practice by which voters sympathetic to one party vote in the primary of another party for the purpose of distorting that primary's CT Page 11055 results. While recognizing that Illinois had a legitimate interest in preventing "raiding," the court, however, determined that the method chosen to effect that goal was not justified as it "conspicuously infringes upon basic constitutional liberty."Kusper v. Pontikes, supra, 57-61.
Fand also draws upon Kusper v. Pontikes, supra, and Mandaniciv. Fischer, supra, which support his argument that Sec. 9-61
violates his freedom of association. Legnard counters that theKusper case is inapposite, and that Marchitto v. Knapp, supra, is still applicable to the case at hand. Marchitto, not unlike Fand, alleged that the names were unjustly and improperly removed from the enrollment list of the Republican Party for two years, in accordance with Sec. 9-60, because their names appeared on a ballot solely under another party designation.
As noted, supra, Sec. 9-60 authorizes the erasure or exclusion of an individual's name from a political party's enrollment list, if the party determines that the individual does not intend to support the principles or candidates of that party. The Marchitto court observed that individual voters and political parties share a reciprocal right to define themselves politically. It further noted that a party's right to freely associate necessarily presupposes the freedom to identify the people who constitute the association, and plainly presupposes a freedom not to associate. The court emphasized that a party could limit its membership to those sharing and supporting the party's interests and principles, and therefore a political party may deny membership to an individual voter who acts in a manner clearly inconsistent with a party's interests. It reasoned that Sec. 9-60 provides political parties with the ability to do precisely that.
The court recognized that not every law that imposes a burden on the right to vote or on political association must be subject to strict scrutiny, and it determined that Sec. 9-60 was constitutional on its face. It reasoned that the statute was a valid exercise of the state's legitimate interest in protecting party members' associational rights by legislating to protect the party from intrusion by those with adverse political principles. It also determined that the statute was constitutional as applied to those plaintiffs.
The court recited that a party should be able to prevent a party member from running as a candidate against that party's CT Page 11056 candidate. It reasoned that neither the courts nor the state may substitute its own judgment for that of the party. It concluded that given the Republican Party's right to define its political association and to remove those members whose interests directly conflict with those of the party, it was loathe to second guess defendants' decision. Marchitto v. Knapp, supra, 916-919. The erasure of Fand's name from the Republican Party enrollment list is persuasive of a substantial impingement upon his freedom of association with that party since it clearly prohibits him from participating in the political process of that party.
The Republican State Central Committee Rules, for example, provide that the state committee "shall consist of . . . members who shall be enrolled Republican electors. . . ." (Article I, Sec. 2.)[4] In addition, officers of the state committee "shall be enrolled Republican electors"; (Article I, Sec. 4(b)); and members or officers of town committees must be enrolled Republican electors of the town or political subdivision at the time of the election and throughout the term of office. (Article II, Sec. 6.) Article III of the Rules further mandates that all delegates and alternates to state conventions "must be enrolled Republican electors in the town or district they represent at the time they act." (Article III, Sec. 4.)
As to national conventions, the rules state that "the state party chairman shall forthwith request in writing of each candidate a list of persons from among whom the candidate wishes the convention to elect the delegates and alternates, both at-large and district, allocated to him as certified by the Secretary of State[,]" and the individuals on the list must be registered Republican voters. (Article III, Sec. 12(c).) Article IV of the Rules requires that delegates and alternates attending district conventions must be "enrolled Republican electors in the town or district they represent at the time they act"; (Article IV, Sec. 3); and Sec. 6 mandates that "endorsement of all delegates to district conventions shall be made by the enrolled members of the Republican Party present and voting at a caucus or by the town committee. . . ." (Article IV, Sec. 6.) The Rules of the Republican Party Town Committee limit membership and office holders of the Town Committee to enrolled Republican electors. (Bethel Town Committee Rules, Sec. I(B).)[5]
Fand's ability to vote at a party primary falls within the purview of Sec. 9-431(a) which provides that "[n]o person shall be permitted to vote at a primary of a party unless (1) he is on CT Page 11057 the last-completed enrolment list of such party in the municipality or voting district . . . or (2) if authorized by the state rules of such party filed pursuant to section 9-374, he is an unaffiliated elector in the municipality. . . ." The Republican State Central Committee Rules provide that "[a]ny elector enrolled as a member of the Republican party shall be eligible to vote in primaries for nomination of candidates for statewide office and candidates for office in the municipality, county or district . . . in which such elector resides and is enrolled." (Article V, Sec. 1(a).)
Certain it is, once again, that Connecticut has an interest in ensuring the integrity of the election process and an "important regulatory interest in protecting political parties from intrusion by individuals with interests adverse to those of the party." Marchitto v. Knapp, supra. However, when, as a consequence, it effectively disaffiliates a person from his pre-existing party affiliation for a "substantial period of time," it runs afoul of the constitutions; Mandanici v. Fischer,
supra, 19; by substantially restricting Fand's ability to change his political party affiliation. See Kusper v. Pontikes, supra.
It also becomes evident that Sec. 9-61 seems to impact the party's associational rights. A state may not "`constitutionally substitute its own judgment for that of the Party.'" (Citation omitted.) Tashjian v. Republican Party of Connecticut, 479 U.S. 208,224, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). Unlike Sec. 9-60, which authorizes erasure by the party, Sec. 9-61 requires automatic erasure without a prior determination of disloyalty by that party. A court could easily find that Sec. 9-61
impermissibly burdens the party's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals which is protected by the constitution. Tashjian v. Republican Party of Connecticut, supra.
Once again, the state's interests in the integrity or the election process and ensuring party member loyalty could be accomplished by less restrictive means, e.g., by authorizing a hearing to grant Fand an opportunity to show cause why his name should not be erased from the party's enrollment list. A court would also most probably conclude that Sec. 9-61 severely restricts Fand's right to freedom of political association, that the statute is not narrowly drawn to advance a compelling state interest, and therefore may well be held to fail constitutional muster. CT Page 11058
EQUAL PROTECTION
He also postulates that Sec. 9-61 creates classifications that burden his fundamental rights to speak, associate and to seek office. He contends that party members seeking office solely under another party's label are treated differently from those who have not done so, and they are also treated differently from party members whose loyalties are suspect for other reasons, because the latter receive hearings to determine loyalty instead of being automatically stricken from the party rolls.
Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the equal protection clause of the fourteenth amendment. Harper v. Virginia Bd. ofElections, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169
(1965) Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized. (Citations omitted.) Kramer v. Union Free School District No. 15,395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1968). In deciding whether a law violates the equal protection clause, a court must look at the character of the classification in question, the individual interests affected by the classification, and the governmental interests asserted in support of the classification. (Citation omitted.) If a challenged statute grants the right to vote to some citizens and denies the franchise to others, the court must determine whether the exclusions are necessary to promote a compelling state interest. Dunn v. Blumstein, 405 U.S. 330-337, 92 S.Ct. 995,31 L.Ed.2d 274 (1971). In Harper, Kramer, and Dunn, the Supreme Court examined statutes that imposed classifications that restricted the rights of certain individuals to participate in the electoral process. It concluded that the statutes at issue in each case violated the equal protection clause of the fourteenth amendment.
In Harper, the court emphasized that where fundamental rights and liberties are asserted under the equal protection clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined. It held that Virginia's poll tax violated the equal protection clause because wealth or fee paying has no relation to voting qualifications; the right to vote is too precious, too fundamental to be so CT Page 11059 burdened or conditioned. It observed that the interest of the state, when it comes to voting, is limited to the power to fix qualifications, but that wealth was not germane to one's ability to participate intelligently in the electoral process. It emphasized that as a condition of obtaining a ballot, the requirement of fee paying causes an invidious discrimination that runs afoul of the equal protection clause. Harper v. VirginiaBoard of Elections, supra, 668, 670.
In Dunn, the court reviewed Tennessee's durational residence statute, which authorized voting registration only for persons who had been residents of the state and of the county for a specified period of time. It observed that durational residence laws penalized individuals who travel from one place to another during the qualifying period, and that such laws divide residents into two classes, old residents and new residents, and discriminate against the latter to the extent of totally denying them the opportunity to vote.
The state had advanced two interests that would be served by the durational residence requirements: to protect against fraud and to ensure knowledgeable voters. The court opined that the state's primary concern was that nonresidents would temporarily invade the state or county, become eligible to vote by falsely swearing that they were residents, and by voting, would allow a candidate to win by fraud. It agreed that preventing such fraud was a legitimate and compelling government goal, but that it was impossible to view durational residence requirements as necessary to achieve that state interest. It noted, however, that this purpose was already served by Tennessee's system of voter registration and explained that the state's legitimate purpose was to determine whether certain persons in the community were bona fide residents. A durational residence requirement creates a classification that may, in a crude way, exclude nonresidents from that group. But it also excludes many residents. Given the state's legitimate purpose and the individual interests that are affected, the classification was all too imprecise. It was further concluded that the waiting period was not the least restrictive means necessary for preventing fraud.
In speaking to the state's goal of having "knowledgeable voters," it emphasized that there was nothing to support the "conclusive presumption" that residents who lived in the state for less than a year, and in their county for less than three months, were uninformed about elections. It determined that the CT Page 11060 durational residence requirements "crudely" excluded large numbers of fully qualified people. It observed that since the state created a waiting period by closing its registration books thirty (30) days before an election, there can be no basis for arguing that any durational residence requirement is also needed to assure knowledgeability.
It concluded that given the exacting standard of precision it requires of statutes affecting constitutional rights, it could not say that durational residence requirements were necessary to further a compelling state interest. It held that the state had not offered an adequate justification for its durational residence laws. Dunn v. Blumstein, supra, 334-360.
In Kramer, the court considered a statute that limited the vote in school district elections to property owners and parents of school children. It determined that the statute did not meet the exacting standard of precision required of statutes which selectively distribute the franchise. It explained that the statutory classifications permit inclusion of many persons who have, at best, a remote and indirect interest in school affairs and, on the other hand, exclude others who have a distinct and direct interest in the school meeting decisions. Kramer v. UnionFree School District, supra, 622-632.
Once again, Sec. 9-61 mandates that party members seeking office solely under a party designation other then the party in which they are enrolled are automatically erased from their party's enrollment list for a period of two years without a hearing. Party members whose loyalties are suspect for other reasons, however, are entitled to hearings in which the party makes a determination with respect to their loyalties. While the statute creates a classification in which certain individuals are subject to mandatory erasure without a hearing, is the automatic exclusion necessary to promote a compelling interest, and, if so, is it the least restrictive means necessary for achieving that interest?
Again, it must be conceded that Connecticut has an interest in protecting political parties from intrusion by individuals with interests adverse to those of the party. Marchitto v. Knapp,
supra, 918. However, Sec. 9-60 and other provisions contained in Sec. 9-61, demonstrate that a less restrictive method does exist to achieve such an interest, i.e., the provision for a hearing in which the party could make a determination with respect to a CT Page 11061 member's loyalty in each individual case.
Therefore, a court might well easily and properly find that the automatic exclusion mandated by Sec. 9-61 is unnecessary to promote a compelling state interest, and that a less restrictive method exists to achieve such an interest. A court, therefore, would be faced with a seemingly impossible burden to find the statute here challenged can pass constitutional muster.
The time honored rubrics of temporary injunction proceedings require the petitioner to establish the inadequacy of a remedy at law and irreparable injury. Over the years, the strong probability of ultimate success on the merits has generally been recognized as a corollary. See Covenant Radio Corporation v. TenEighty Corporation, 35 Conn. Sup. 1, 3; Boesch V. JohnsonWholesale Perfume Co., 9 Conn. Sup. 110, 111; Stocker v.Waterbury, 154 Conn. 446, 449, Weaver v. Ives, 52 Conn. 586, 590-91. Evidence is required to satisfy the rules. In this instance, however, the statute in issue has been attached as facially repugnant to all constitutions. The factual predicate is not in dispute and the court is satisfied that taking of evidence is neither necessary nor desirable.
In accordance with the foregoing, Mary H. Legnard and each of her officers, servants, agents and employees are commanded to forthwith restore the name of Robert Fand to the Enrollment List of the Republican Party of the Town of Bethel; and the said Mary H. Legnard and each of her officers, servants, agents and employees are further commanded and enjoined to wholly and absolutely desist and refrain erasing, removing, deleting, obliterating or otherwise preventing the inclusion and display of the name of Robert Fand from the Enrollment List of the Republican Party of the Town of Bethel until further order of the court.
Moraghan, J.